Marie TOVAR, Individually and as Representative of The Estate of Guadalupe M. Rodriguez, Guadalupe Palacios, and Gilda Sanchez, Appellants,

v.

METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD., L.L.P., d/b/a Southwest Texas Methodist Hospital, Appellee.

No. 04–05–00054–CV.

Court of Appeals of Texas, San Antonio.

Nov. 16, 2005.

Jeff Small, Law Office of Jeff Small, M. Stephen Cichowski, Cichowski & Gonzalez, P.C., San Antonio, for appellants.

Lucretia R. Marmor, Ruth G. Malinas, Ball & Weed, P.C., San Antonio, for appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from the trial court's dismissal of appellants' medical malpractice case against appellee on the grounds that appellants' expert report did not satisfy the requirements of the Medical Liability and Insurance Improvement Act ("the Act"). In the underlying lawsuit, appellants sued three doctors and Southwest

Methodist Hospital, alleging, in part, that the hospital nurses' negligence resulted in a delay in diagnosis that caused Guadalupe M. Rodriguez's condition to deteriorate. Appellants contend the delay in diagnosis delayed the discovery of a cerebral hemorrhage. According to appellants, if the hemorrhage had been discovered and treated sooner, Ms. Rodriguez's neurological deterioration and death could have been averted. We reverse and remand.

## BACKGROUND

On June 7, 2001 at approximately 1:26 p.m., seventy-five-year-old Guadalupe M. Rodriguez arrived at the hospital. Although she was alert and oriented at the time, she complained of a headache and right-arm numbness. Ms. Rodriguez was evaluated and an order admitting her to the Neurological Care Unit was written at approximately 5:10 p.m. However, she was not admitted to the unit until approximately 8:00 p.m., allegedly because of a nursing shortage. Over the next several hours, Ms. Rodriguez was seen by doctors who evaluated her condition, and nurses who documented her condition. At 9:30 p.m., a call placed to Dr. Chandrahasan was returned by Dr. Osonma, who ordered medication to treat Ms. Rodriguez's blood pressure and nausea. At 12:30 a.m. the next morning, the nursing personnel called Dr. Garrison and reported neurological changes and elevated blood pressure. Dr. Garrison ordered an emergency CT scan, which revealed a massive occipital parietal temporal hemorrhage. At 3:45 a.m., Ms. Rodriguez underwent surgery, following which she was kept on life-support until she was transferred to a hospice where she died on June 13, 2001.

After filing suit against the hospital and doctors, appellants filed the expert report of Dr. Kenneth C. Fischer. The hospital moved to dismiss appellants' claims on the grounds that Dr. Fischer's report did not adequately address the elements of standard of care, breach, and causation. After a hearing, the trial court granted the motion, and severed appellants' claims against the hospital from their claims against the doctors. This appeal ensued.

## ADEQUACY OF EXPERT REPORT

■ Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT. ART. 4590i, § 13.01(d) (Vernon Supp. 2003);[1] *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV. CIV. STAT. ART. 4590i, § 13.01(r)(6). If a defendant moves to dismiss the plaintiff's case based upon the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section." *Id.* § 13.01(*l*). To constitute a "good-faith effort," the report must provide enough information to (1) inform the defendant of the specific conduct the plain-

---

1. Article 4590i was repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884, and has been recodified at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2004) (effective Sept. 1, 2003). Because the underlying lawsuit was filed on August 11, 2003, all references in this opinion will be to former article 4590i.

tiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

A trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Id.* at 878. Although the report need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Id.* A report cannot merely state the expert's conclusions about these elements. *Id.* at 879. Instead, "the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002).

## STANDARD OF CARE AND BREACH OF THE STANDARD

The standard of care for a hospital or other medical provider is what an ordinarily prudent hospital or other medical provider would do under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880; *see also Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical because whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880.

Dr. Fischer's report stated the following with regard to the standard of care and the nurses' alleged breach of the standard of care:

> ... [T]he nursing personnel provided poor documentation of the clinical status of Ms. Rodriguez between 5 p.m. and 9 p.m. Despite the patient's obvious dete-

rioration at that time, they meekly accepted inadequate responses of Dr. Garrison and Dr. Osonma with no further calls to physicians until 12:30 a.m. when the patient was in extremis. The appropriate standard of care for nursing personnel treating a patient with acute neurological process is to promptly and expeditiously transfer the patient to the appropriate setting and carefully inform the treating physicians of changes in the patient's clinical status so that appropriate care can be rendered. The nursing personnel ... failed to perform these critical functions in their management of Ms. Rodriguez, thereby breaching the standard of care.

We conclude Dr. Fischer's report sufficiently sets forth the standard of care because he specifically states what should have been done for a patient "with acute neurological process." We also conclude Dr. Fischer's report sufficiently sets forth how the standard of care was breached because he specifically states what the nurses should have, but did not, do.

## CAUSATION

To constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios's* two-part test. *See Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 879. It is not enough that the expert report "provided insight" about the plaintiff's claims. *Wright,* 79 S.W.3d at 52. Nor may liability in a medical malpractice suit be made to turn upon speculation or conjecture. *See Hutchinson v. Montemayor,* 144 S.W.3d 614, 618 (Tex.App.-San Antonio 2004, no pet.). Therefore, although a fair summary is something less than all the evidence necessary to establish causation at trial, a fair summary must contain sufficiently specific information to demonstrate causation beyond mere conjecture in order to

meet the Act's requirements and satisfy the *Palacios* test. *See Wright*, 79 S.W.3d at 52.

On causation, Dr. Fischer's report stated the following:

> The results of the standard of care departures exercised by Dr. Chandrahasan, Garrison, Osonma, and the nursing personnel in the ER and the receiving floor caused a substantial delay in the appropriate diagnosis and initiation of treatment for the cerebral hemorrhage sustained by Ms. Rodriguez. This type of lesion harbored by Ms. Rodriguez requires prompt cessation of the Coumadin, an immediate brain CT scan, immediate institution of fresh frozen plasma to reverse the Coumadin, and obtaining neurological and neurosurgical consultation on a stat basis. The failure of Dr. Chandrahasan to promptly have the patient transferred to the ICU from the ER as well as his failure to convey the particulars of Ms. Rodriguez' [sic] clinical situation to his on-call physician, Dr. Osonma, delayed the addressing of the patient's clinical deterioration. Similarly, the failure of Dr. Osonma and Dr. Garrison to respond appropriately to the changes conveyed to them by the nursing personnel also delayed realization of the appropriate diagnosis. *Again, the failure of the nursing personnel to insist upon prompt evaluation of the patient's changing clinical status further delayed diagnosis. Had the appropriate diagnosis been made expeditiously in the afternoon hours, when it should have been, instead of 2 a.m. in the morning, when it was finally discovered, the hemorrhage would have been detected at a much earlier stage with the possibility of only medical treatment required as opposed to the desperate and unsuccessful surgery which transpired at 3:45 a.m. Within reasonable medical probability, the dramatic neurological deterioration and death of Ms. Rodriguez would have been averted. The failure of the doctors and nursing personnel to perform within appropriate medical and nursing standards unfortunately caused this untoward result.* (Emphasis added.)

The hospital asserts Dr. Fischer's report contains no factual statements or explanation supporting his conclusion that the nurses' conduct caused Ms. Rodriguez's death; does not identify what the nurses failed to communicate to the physicians between 9:30 p.m. and 12:30 a.m., and does not identify what information the doctors should have acted upon. The hospital argues Dr. Fischer's report is no more adequate than the reports considered by this court in *Lopez v. Montemayor*, 131 S.W.3d 54 (Tex.App.-San Antonio 2003, pet. denied) and *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245 (Tex. App.-San Antonio 2004, no pet.). We disagree.

In *Lopez*, the plaintiffs relied on the following single sentence in the report to establish causation: "Additionally, it is the aspiration of the bridge section which caused and precipitated the medical circumstances leading to the patient's demise." 131 S.W.3d at 60. A panel of this court concluded that this statement was conclusory, and did not constitute a good faith effort to comply with the statute's causation requirement because the statement did not provide information linking Montemayor's actions to Lopez's death. *Id.*

In *Costello*, the expert report contained the following single sentence on causation: "Dr. Schilling's report states, 'If this patient would have been appropriately triaged and evaluated, then in all reasonable medical probability she would have sur-

vived.'" *Costello,* 141 S.W.3d at 249. A panel of this court held that the expert's assertion that the patient would have survived was conclusory and we listed a variety of deficiencies in the report. *Id.* For example, the report did not explain the causal connection between failure to appropriately triage and evaluate and the patient's death; offered no explanation of what medical information a more timely triage and evaluation would have revealed; did not state what would have been done had Christus not failed to act; did not state how Christus' failure to act was a substantial factor in bringing about the patient's death and without which her death would not have occurred; and did not explain the medical basis or reasoning for the conclusion that Lozano "in all reasonable medical probability" would have survived. *Id.*

 Although our opinion in *Costello* listed these various deficiencies, this list should not be construed as mandatory. As we stated in *Costello,* the Act requires only "a 'fair summary'" of the expert's opinions. *Id.* Here, the expert report meets that requirement. Dr. Fischer links his conclusion regarding the nurses' alleged breach of the standard of care with his conclusion that Ms. Rodriguez's neurological condition would not have deteriorated, resulting in the need for surgery. Dr. Fischer states that if the nurses had "carefully inform[ed] the treating physicians of changes in the patient's clinical status ... [the] type of lesion harbored by Ms. Rodriguez .... [should have resulted in] prompt cessation of the Coumadin, an immediate brain CT scan, immediate institution of fresh frozen plasma to reverse the Coumadin, and obtaining neurological and neurosurgical consultation on a stat basis ... [then] ... [w]ithin reasonable medical probability, the dramatic neurological deterioration and death of Ms. Rodriguez

would have been averted." We conclude Dr. Fischer's report satisfies the Act's requirement on causation.

## CONCLUSION

 "[A] plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. We conclude that Dr. Fischer's report put the defendant on notice of the conduct complained of, and represents a good-faith effort to provide a fair summary of the statutory elements of standard of care, breach, and causation. For these reasons, we reverse the trial court's order of dismissal and remand the cause for further proceedings.