MEMORANDUM OPINION




No. 04-06-00546-CV



 Richard M. EVANS, M.D., Richard M. Evans, M.D., P.A. d/b/a Medical Center
Ophthalmology Associates, Steven J. Fisher, M.D., P.A. d/b/a Medical Center
Ophthalmology Associates, Michael A. Singer, M.D., P.A. d/b/a Medical Center
Ophthalmology Associates, Medical Center Ophthalmology Associates, 9157
Huebner G.P., L.L.C., 9157 Huebner, L.T.D., and 9157 Leasing, L.T.D.,

Appellants



v.



Charles ARAMBULA and Belia Arambula,


Appellees



From the 288th Judicial District Court, Bexar County, Texas


Trial Court No. 2005-CI-14529


Honorable Lori Massey, Judge Presiding



Opinion by: Catherine Stone, Justice


Sitting: Alma L. López, Chief Justice

 Catherine Stone, Justice

 Rebecca Simmons, Justice


Delivered and Filed: March 21, 2007


AFFIRMED

 Appellants, Richard Evans, M.D., Richard Evans, M.D., P.A. d/b/a Medical Ophthalmology
Associates, Steven Fisher, M.D., P.A. d/b/a Medical Ophthalmology Associates, Michael Singer,
M.D., P.A. d/b/a Medical Ophthalmology Associates, Medical Center Ophthalmology Associates,
9157 Huebner GP, L.L.C., 9157 Leasing, Ltd, and 9157 Huebner Ltd., file this interlocutory appeal
from the trial court's denial of their motion to dismiss a health care liability claim. See Tex. Civ.
Prac. & Rem. Code Ann. § 51.014 (a)(9) (Vernon Supp. 2006). We affirm.

Background

 Charles Arambula was diagnosed with glaucoma in 2001, and was under the care of Dr.
Richard Evans for his condition. On September 9, 2003, Evans examined Arambula and learned that
Arambula had a high eye pressure in his right eye. Dr. Evans recommended that Arambula undergo
SLT laser surgery (laser trabeculoplasty) -- as opposed to incisional surgery (trabeculectomy) -- 
to relieve the pressure in his eye. (1) Evans, however, waited approximately two weeks before having
Arambula undergo this surgery. On September 23, 2003, the date when Arambula underwent his
procedure, Arambula had lost most, if not all, of the vision in his right eye. Consequently, the laser
surgery performed on Arambula's right eye was unsuccessful. Arambula subsequently underwent
an incisional surgery on his right eye on October 27, 2003. Unfortunately, Arambula's vision in his
eye could not be saved by this time. 

 Arambula and his wife filed a health care liability claim against Evans and his affiliates, Dr.
Steven Fisher, Dr. Michael Singer, Medical Center Ophthalmology Associates, 9157 Huebner GP,
L.L.C., 9157 Leasing, Ltd., and 9157 Huebner Ltd. (collectively "Evans") on October 17, 2005, 
alleging, inter alia, that Evans failed "to timely perform the appropriate surgery to save Mr.
Arambula's vision in his right eye." (2) The Arambulas timely filed the expert report and curriculum
vitae of ophthalmologist and biomedical engineer Dr. Seymour Kern. Evans, in turn, timely filed
objections to the report and a motion to dismiss with prejudice, arguing: (1) Dr. Kern is unqualified
to give his opinion about the treatment of glaucoma or trabeculoplasty; and (2) Dr. Kern's report fails
to satisfy the requirements of section 74.351(r)(6) because it does not provide a fair summary of his
opinions regarding the causal relationship between Evans's alleged breach of the applicable standard
of care and Arambula's injury. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon
Supp. 2006) (requiring that the expert report provide a fair summary of the expert's opinions
regarding applicable standards of care, the manner in which the care rendered by the particular
physician failed to meet the standards, and the causal relationship between that failure and the
claimed injury, harm, or damages). 

 At the ensuing hearing, the trial court determined that Dr. Kern's expert report and
curriculum vitae did not sufficiently establish his qualifications as an expert regarding the treatment
of glaucoma or any of the procedures relevant to the Arambulas' claims. In addition, the court
concluded that Dr. Kern's report failed "to sufficiently specify how the alleged breaches in the
standard of care applicable [to Evans] proximately caused [Arambula's] injuries." Although the trial
court granted the Arambulas a thirty-day extension to cure the aforementioned deficiencies, it
dismissed with prejudice all claims against the defendants not based on vicarious liability. 

 The Arambulas filed Dr. Kern's supplemental expert report before the deadline for filing such
report. Besides filing Dr. Kern's supplemental report, the Arambulas filed the expert report and
curriculum vitae of a completely different expert, Dr. Kent Bashford. Evans, in turn, timely filed
objections to both reports and moved to dismiss. With respect to the supplemental report of Dr.
Kern, Evans argued that the report fails to demonstrate that Dr. Kern is qualified to give his opinion
on the treatment of glaucoma or any of the procedures relevant to Arambula's claim. Evans also
argued that the report fails to provide a fair summary of Dr. Kern's opinions regarding the causal
relationship between the alleged breach of the applicable standard of care and Arambula's injury. 
As for Dr. Bashford's report, Evans argued that the report: (1) is untimely because the Arambulas
did not serve the report within 120 days of filing their petition; (3) and (2) fails to satisfy the
requirements of section 74.351(r)(6) because it does not provide a fair summary of the expert's
opinions as to the applicable standard of care, the manner in which Evans breached such standard
of care, or the causal relationship between Evans's alleged breach and Arambula's injury. The trial
court, after a hearing, denied Evans's motion to dismiss and this appeal followed. 

Applicable Law & Standard of Review We review a trial court's decision on a motion to dismiss a case under section 74.351 of the
Texas Civil Practice and Remedies Code for an abuse of discretion. Manor Care Health Servs., Inc.
v. Ragan, 187 S.W.3d 556, 561 (Tex. App.--Houston [14th Dist.] 2006, pet. filed). Section
74.351(l) provides that a trial court should grant a motion challenging the adequacy of an expert
report if the report does not represent an objective good faith effort to comply with the definition of
an expert report in subsection (r)(6). Tex. Civ. Prac. & Rem.Code Ann. § 74.351(l); Ragan, 187
S.W.3d at 561. Subsection (r)(6) defines an "expert report" as a written report providing a fair
summary of the expert's opinions regarding the standard of care, the manner in which the care
rendered by the health care provider failed to meet the standard of care, and the causal relationship
between that failure and the harm claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6);
Ragan, 187 S.W.3d at 561-62. Additionally, in order for there to be an acceptable report, the expert
must establish that he is qualified to render his opinions. Tex. Civ. Prac. & Rem. Code Ann.
§ 74.351(r)(5); Ragan, 187 S.W.3d at 562. 

 When determining whether a report represents a good faith effort to comply with the statute,
the trial court's inquiry is limited to the four corners of the report. Longino v. Crosswhite, 183
S.W.3d 913, 916 (Tex. App.--Texarkana 2006, no pet.). "A 'good faith' effort requires that the
report discuss the standard of care, breach, and causation with sufficient specificity to inform the
defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court
to conclude that the claims have merit." Id. The expert report is not required to prove the
defendant's liability, but rather only to provide notice of what conduct forms the basis of the
plaintiff's complaints. Id. The omission of any of the statutory elements prevents the report from
being a good faith effort. Id. at 917. Further, a report that merely states the expert's conclusions
about the standard of care, breach, and causation does not meet the statutory requirements. Id.

Discussion


 On appeal, Evans argues that the trial court erred in denying the motion to dismiss because:

(1) Dr. Kern does not qualify as an expert; and (2) neither Dr. Kern's report nor Dr. Bashford's
report provides a fair summary of the expert's opinions on the issue of causation. (4) 


Expert Qualifications of Dr. Kern


 Evans contends that Dr. Kern does not qualify as an expert on the issues of whether Evans
departed from the accepted standards of medical care and causation. See Tex. Civ. Prac. & Rem.
Code Ann. §§ 74.401, .403 (Vernon 2005). Pursuant to section 74.401 of the Civil Practice and
Remedies Code, a person may qualify as an expert witness on the issue of whether the physician
departed from accepted standards of medical care only if the person is a physician who: (1) is
practicing medicine at the time such testimony is given or was practicing medicine at the time the
claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or
treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis
of training or experience to offer an expert opinion regarding those accepted standards of medical
care. Id. § 74.401(a). "In determining whether a witness is qualified to testify on the basis of
training or experience, the court shall consider whether, at the time the claim arose or at the time the
testimony is given, the witness: (1) is board certified or has other substantial training or experience
in an area of medical practice relevant to the claim; and (2) is actively participating in rendering
medical care relevant to the claim." Id. § 74.401(c). Except in situations not relevant here, "a person
may qualify as an expert witness on the issue of the causal relationship between the alleged departure
from accepted standards of care and the injury, harm, or damages claimed only if the person is a
physician and is otherwise qualified to render opinions on that causal relationship under the Texas
Rules of Evidence." Id. § 74.403(a). Rule 702 of the Texas Rules of Evidence requires that an
expert be qualified "by knowledge, skill, experience, training, or education" and that the testimony
"assist the trier of fact." Tex. R. Evid. 702. 

 Based upon Dr. Kern's first report, supplemental report, and curriculum vitae, we believe the
trial court properly concluded that Dr. Kern qualifies as an expert on whether Evans departed from
accepted standards of medical care and causation. Regarding his qualifications, Dr. Kern stated in
his first report that: 

 I am a medical doctor and a biomedical engineer and I design equipment with a
subspecialty in ophthalmology. I have three patents for medical devices that are for
the diagnosis and treatment of eye related disorders including one specifically for
laser surgery to shape corneal tissue. I have experience in treating patients and
working on the design of medical devices for patients with conditions similar to those
experienced by Charles Arambula. Based on my practice experience, I am familiar
with the standard of care applicable to the diagnosis and treatment of patients with
conditions like or similar to those of Charles Arambula on or about September 9,
2003.


He further noted in his supplemental report that: 

 While my practice has emphasized refractive surgery, my extensive experience in
developing and using lasers has given me detailed knowledge, beyond that of a
physician trained as a general ophthalmologist, in the applications, mechanics and
limitations of laser surgery. During my career, I have studied in great detail all lasers
used in eye surgery, their applications and their limitations. . . . As part of my training
as a specialist in ophthalmology, which occurred in 1970-73, I did glaucoma
rotations. I also saw glaucoma patients in general practice. For at least six years, I
have served, and continue to serve, as a consultant to other physicians who provide
direct patient care, upon the request of those physicians.


Dr. Kern's curriculum vitae also details significant professional and research experience in the areas
of general ophthalmology and the use of lasers in the field of ophthalmology. 

 First, pursuant to section 74.401(a)(1), Dr. Kern's reports and curriculum vitae indicate that
Dr. Kern is a physician who was practicing medicine during the requisite periods. See id.
§ 74.401(a)(1). Dr. Kern states in his supplemental report that the last six years he has "served, and
continue[s] to serve, as a consultant to other physicians who provide direct patient care, upon the
request of those physicians." The statute expressly recognizes that "serving as a consulting physician
to other physicians who provide direct patient care, upon the request of such other physicians"
constitutes practicing medicine. Id. § 74.401(b). Dr. Kern's supplemental report thus demonstrates
he is "practicing medicine."

 Second, pursuant to section 74.401(a)(2), Dr. Kern's reports and curriculum vitae
demonstrate that he "has knowledge" of accepted standards of medical care for the diagnosis, cure,
or treatment of the illness, injury, or condition involved in the claim. See id. § 74.401(a)(2). The
underlying case concerns the treatment of glaucoma. Specifically, the Arambulas complain that
Evans "fail[ed] to timely perform the appropriate surgery to save Mr. Arambula's vision in his right
eye." With regards to Dr. Kern's "knowledge" of the treatment of glaucoma, his reports and
curriculum vitae indicate that he is engaged in the practice of medicine in the area of ophthalmology. 
Dr. Kern's reports indicate that he has had the opportunity to treat glaucoma patients, like 
Arambula, both while he was training to become a specialist in ophthalmology and after such
training was completed during the course of his general practice. The reports also indicate that Dr.
Kern has had the opportunity to design medical devices used to treat patients with conditions similar
to those experienced by Arambula. Dr. Kern's reports and curriculum vitae thus demonstrate Dr.
Kern is familiar with the treatment of glaucoma and the accepted standards of medical care at issue
in this case.

 Finally, pursuant to section 74.401(a)(3), Dr. Kern is qualified on the basis of training and
experience to offer an expert opinion regarding the accepted standards of medical care for 
Arambula. See id. § 74.401(a)(3). Dr. Kern has indicated in his reports and curriculum vitae that
he has substantial training and experience, as well as active participation in rendering medical care, 
in areas relevant to the claim. Dr. Kern's reports and curriculum vitae reflect that Dr. Kern has
decades of experience practicing as a treating and consulting physician in the area of ophthalmology. 
Dr. Kern has indicated that he has used lasers during his practice and has had the opportunity to help
develop them as well. He has also "studied in great detail all lasers used in eye surgery." As a result
of his experiences, Dr. Kern attests that he has acquired knowledge, beyond that of a physician
trained as a general ophthalmologist, concerning the use of lasers in the field of ophthalmology and
the applications and limitations of laser surgery. Because Dr. Kern's reports and curriculum vitae
show that Dr. Kern is qualified on the basis of training and experience to offer an expert opinion
regarding the accepted standards of medical care for Arambula, we hold Dr. Kern is qualified to offer
an expert opinion of the issue of whether Evans departed from the accepted standards of medical
care.

 Further at issue is whether Dr. Kern is qualified to offer an expert opinion on the issue of
causation. See id. § 74.403(a). As previously noted, Dr. Kern's reports and curriculum vitae reveal
that he is an ophthalmologist who, through experience and study, is familiar with both the treatment
of glaucoma as well as the use of lasers in the field of ophthalmology and the applications and
limitations of laser surgery. Dr. Kern's reports and curriculum vitae thus demonstrate that Dr. Kern
possesses specialized knowledge as to the specific issues before the court. In light of Dr. Kern's
familiarity with the subject matter at issue, his specialized knowledge will certainly assist the trier
of fact. We therefore conclude that Dr. Kern is qualified to offer an expert opinion on the issue of
causation. (5)

Adequacy of Dr. Kern's Report

 Evans further complains that Dr. Kern's reports fail to provide a fair summary on the issue
of causation. An expert report cannot merely state the expert's conclusions about causation. See
Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002). "'[R]ather, the expert must explain
the basis of his statements to link his conclusions to the facts.'" Id. (citing Earle v. Ratliff, 998
S.W.2d 882, 890 (Tex. 1999)). 

 Dr. Kern's first report provides as follows:

 Dr. Evans failed to meet the minimum standard of care for an ophthalmologist in
caring for Charles Arambula in the following specific ways:

 

 1. Dr. Evans failed to give [Arambula] the option of incisional surgery versus
SLT laser surgery on September 9, 15, and 23, 2003;

 

 2. Dr. Evans failed to advise [Arambula] of the risks and benefits of incisional
surgery versus the risks and benefits of SLT laser surgery on September 9, 15,
and 23, 2003;

 

 3. Dr. Evans failed to recommend, perform or refer incisional surgery for
Charles Arambula on September 9, 15, and 23, 2003[,] which would have
more quickly reduced the pressure in the right eye of [Arambula]. This
would have been subject to [Arambula's] decision after consultation about
risks and benefits, but the incisional surgery should have been recommended
over SLT laser surgery; and 

 

 4. Dr. Evans failed to properly address the urgency of the situation when he
allowed [Arambula] to go without treatment for the high pressure in his right
eye for two consecutive weeks, September 9 through 23, 2003, at the end of
which time on September 23, 2003 he referred [Arambula] for SLT laser
surgery which itself generally takes four-to-six weeks to result in a reduction
in pressure in the right eye.


***


 The minimum standard of care for an ophthalmologist caring for a patient like
[Arambula] with high eye pressure and glaucoma consists of the following:

 

 1. Dr. Evans should have given [Arambula] the option of incisional surgery
versus SLT laser surgery on September 9, 15, and 23, 2003;

 

 2. Dr. Evans should have advised [Arambula] of the risks and benefits of
incisional surgery versus the risks and benefits of SLT laser surgery on
September 9, 15, and 23, 2003;

 

 3. Dr. Evans should have recommended, performed or referred incisional
surgery for [Arambula] on September 9, 15, and 23, 2003[,] which would
have more quickly reduced the pressure in the right eye of [Arambula]. This
would have been subject to [Arambula's] decision after consultation about
risks and benefits, but the incisional surgery should have been recommended
over SLT laser surgery; and 

 

 4. Dr. Evans should have addressed the urgency of the situation and not allowed
[Arambula] to go without treatment for the high pressure in his right eye for
two consecutive weeks, September 9 through 23, 2003, at the end of which
time on September 23, 2003 he referred [Arambula] for SLT laser surgery
which itself generally takes four-to-six weeks to result in a reduction in
pressure in the right eye.


***

 These specific failures of Dr. Evans to meet the minimum standard of care in caring
for [Arambula] as specifically detailed above were a direct and proximate cause of
[Arambula's] premature loss of vision in his right eye. But for the negligence of Dr.
Evans[,] [Arambula] would not have suffered premature loss of vision in his right
eye.

 

 [Arambula] had high pressure in his right eye which could have been immediately
reduced by incisional surgery. Although incisional surgery has a slightly higher risk
of infection and damage to the eye than SLT laser surgery, incisional surgery offers
immediate release of pressure whereas SLT laser surgery generally does not relieve
pressure for four to six weeks. In the case of [Arambula,] immediate reduction in
pressure in the right eye needed to be accomplished in order to prevent loss of vision.


Dr. Kern's supplemental report added the following: 

 [Arambula's] problem was straightforward. On 9/9/03, [Arambula] had a right eye
pressure of over 40. On 9/15/03, his pressure was 37. This meant that eye fluid,
which normally drains from the eye, was trapped. The build up in pressure,
especially this high of a pressure, can cause damage to the optic nerve with resulting
vision loss. With [Arambula's] long history of glaucoma, this high of a pressure calls
for treatment to effect an immediate drop in pressure. Only incisional surgery can do
this. Incisional surgery makes a direct drainage passageway which allows fluid to
pass. 


 Laser surgery (which Dr. Evans ordered, and then delayed for two weeks) involves
directing a laser beam into the trabecular meshwork. A normally functioning
meshwork drains fluid from the eye by a series of tiny canals or channels feeding into
the bloodstream. It is thought that the laser causes scar tissue to form in the
meshwork, which allows the fluid to more easily flow out, resulting in a decrease in
eye pressure. But this result typically takes four to six weeks to achieve. [Arambula]
needed quick relief from this high pressure. This is basic physics. It is a reasonable
medical probability that, had the pressure been relieved, his vision would have been
retained.

 As previously noted, the statute requires only "a fair summary of the expert's opinions." See
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). Here, Dr. Kern's expert reports meet that
requirement as to the issue of causation. Dr. Kern's reports specifically state what Evans should
have done and what happened because he failed to do it. The substance of Dr. Kern's reports is that
Evans breached the standard of care by allowing Arambula to go without treatment for the high
pressure in his right eye for two consecutive weeks and not advising, recommending, or performing
incisional surgery. The reports explain that with Arambula's long history of glaucoma, the high
pressure he was experiencing in his eye called for a treatment that would lead to an immediate drop
in pressure. The reports suggest that incisional surgery should have been performed on Arambula
because such procedure releases pressure in the eye immediately as opposed to laser surgery, which
takes weeks to take effect. The report then provides that, had Evans not breached the standard of
care, Arambula, within a reasonable medical probability, would have retained his vision. Because
Dr. Kern's reports explain the basis of his statements and link his conclusions to the facts, see
Wright, 79 S.W.3d at 52, we conclude that his reports satisfy the statute's requirement on the issue
of causation. (6)

Conclusion

 Based on the foregoing, we hold that Dr. Kern is qualified as an expert on the issues of
whether Evans departed from the accepted standards of medical care and causation. We further hold
that Dr. Kern's reports, when construed together, provide a fair summary of the elements identified
in section 74.351(r)(6). See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The trial court
therefore had no discretion but to deny Evans's motion to dismiss since the Arambulas provided
Evans with a report addressing the elements identified in the statute from at least one qualified
expert, Dr. Kern. Because Dr. Kern's report is sufficient, we decline to address Evans's complaint
concerning the adequacy of Dr. Bashford's expert report and hold that the trial court did not abuse
its discretion when it denied Evans's motion to dismiss.

 Catherine Stone, Justice




 






 





1. Laser trabeculoplasty is "the placing of surface burns in the trabecular network of the eye to lower intraocular
pressure in open-angle glaucoma." http://medical-dictionary.thefreedictionary.com/trabeculoplasty. By contrast, a
trabeculectomy "is a surgical procedure used in the treatment of glaucoma to relieve intraocular pressure by removing
part of the eye's trabeculum." http://encyclopedia.thefreedictionary.com/Trabeculectomy. A partial thickness flap is
made in the scleral wall of the eye, and a window opening made under the flap to remove a portion of the trabecular 
meshwork. Id. The scleral flap is then sutured loosely back in place. Id. This allows fluid to flow out of the eye through
this opening, resulting in lowered intraocular pressure. Id. 
2. The Arambulas also brought suit against Pacificare of Texas, Inc., who is not a party to this appeal. 
3. See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) ("In a health care liability claim, a claimant shall, not later
than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more
expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider
against whom a liability claim is asserted."). 
4. Although Evans challenged the timeliness of Dr. Bashford's expert report in the trial court, Evans has not
raised a complaint concerning this issue on appeal. 
5. We note that Evans asserts that Dr. Kern is unqualified to render an expert opinion because neither Kern's
reports nor curriculum vitae show that he has any experience "performing" glaucoma related surgeries. We, however,
are unpersuaded by this contention since the Arambulas have not made any claims with regard to the surgical procedure
itself. Thus, we do not believe Dr. Kern is required to have experience actually performing the surgical procedures at
issue to qualify as an expert in this case.
6. See generally Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P., 185 S.W.3d 65, 70 (Tex.
App.--San Antonio 2005, pet. denied) (holding expert adequately linked his conclusion regarding nurses' alleged breach
of the standard of care with his conclusion that patient's condition would not have deteriorated and resulted in the need
for surgery where expert stated "that if the nurses had 'carefully inform[ed] the treating physicians of changes in the
patient's clinical status . . . [the] type of lesion harbored by [the patient] . . . [should have resulted in] prompt cessation
of the Coumadin, an immediate brain CT scan, immediate institution of fresh frozen plasma to reverse the Coumadin,
and obtaining neurological and neurosurgical consultation on a stat basis . . . [then] . . . [w]ithin reasonable medical
probability, the dramatic neurological deterioration and death of [the patient] would have been averted."). Evans
nevertheless criticizes Dr. Kern's reports for not discussing 19 topics he believes should have been addressed by Dr.
Kern. Dr. Kern's reports, however, are more than adequate to inform Evans of the specific conduct the Arambulas have
called into question and to provide a basis for the trial court to conclude that the Arambulas' claims have merit. See Am.
Transitional Care Ctrs., Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex. 2001). We are thus unpersuaded by Evans's
complaint.