NUMBER 13-07-481-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 
 

IHS ACQUISITION NO. 140, INC. D/B/A HARBOR

VIEW CARE CENTER; LYRIC HEALTH CARE

HOLDINGS III, INC.; AND LYRIC HEALTH

CARE, LLC, Appellants,


v.
 


RUDY G. TRAVIS, INDIVIDUALLY AND AS

REPRESENTATIVE OF THE ESTATE OF

CHRISTINA APUSEN, DECEASED; DAVID K.

TRAVIS, JR.; AND MANUEL K. APUSEN, JR., Appellees.

 




On appeal from the County Court at Law No. 4


of Nueces County, Texas.


 




MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion by Justice Benavides



 In this interlocutory appeal, we evaluate challenges to the professional qualifications
of a medical expert and to the sufficiency of the expert report's "causation" analysis. We
first find that the trial court did not abuse its discretion by approving the expert's
qualifications because his particular field of medical expertise--geriatric care--is
substantially similar to the field of nursing home care, which is the field underlying the claim
in this case. Second, we find that the trial court did not abuse its discretion by finding the
causation analysis in the expert report comported with all statutory requirements. See Tex.
Civ. Prac. & Rem. Code Ann. §§ 74.351, 74.402 (Vernon Supp. 2007). Because we
discern no abuse of discretion, we affirm the judgment of the district court.

I. Factual Background

 The appellants are IHS Acquisition No. 140, Inc. d/b/a Harbor View Care Center;
Lyric Health Care Holdings III, Inc.; and Lyric Health Care, LLC (collectively "Harbor View"). 
Harbor View is a nursing home in Corpus Christi, Texas. The appellees are the estate and
heirs of Christina Apusen (1) (collectively "the Apusens"), an elderly woman who was
admitted to Harbor View on February 3, 2004 with numerous maladies: coronary artery
disease, diabetes mellitus, hypertension, kidney failure, Alzheimer's dementia, peripheral
vascular disease, osteoarthritis, depression, and esophageal reflux. The Apusens allege
that Harbor View provided Ms. Apusen with negligent care and treatment while she was
a resident.

 Ms. Apusen entered Harbor View when she was seventy-four years of age and
spent slightly more than one year there. According to her medical charts, while she was
at Harbor View, the staff believed that she was at great risk for falling and injuring herself
due to her poor balance and impaired vision and hearing.

 On April 10, 2005, the Harbor View staff recorded an injury Ms. Apusen had
suffered to her right eye. The eye was purulent (2) and hot to the touch. At that time, Dr.
Jesus Almanza prescribed drops of gentamycin, an antibiotic used to treat various bacterial
infections. There is no record, however, of the drops being administered on April 10, 11,
12, or 13. Furthermore, medical chart notes reveal that one day earlier, on April 9, 2005,
the nursing staff was ordered to conduct a complete blood count for Ms. Apusen, and the
results of the blood count were not recorded on April 10, 11, 12, or 13.

 On April 14, 2005, at 4:45 A.M., a nurse's note described Ms. Apusen as having a
variety of ailments in her right eye--edema, (3) erythema, (4) heat, pain, and the presence of
foul-smelling fluid. Gentamycin drops were finally administered to Ms. Apusen as
treatment, but the injury had become so severe by this point that Ms. Apusen had to be
transferred to Christus Spohn Hospital. There, she was diagnosed with an abscess of the
eye, septicemia, and third-degree heart blockage. She also had an elevated white blood
cell count.

 Ms. Apusen died at Christus Sphon Hospital on May 10, 2005, slightly less than one
month after having been transferred there from Harbor View. The death certificate is not
available in the clerk's record, but Harbor View claims that the death certificate "stated the
cause of death was cardiogenic shock, (5) precipitated by third-degree heart blockage,
septicemia, and eye abscess formation," and the Apusens do not contest this.

 On October 30, 2006, the Apusens filed a negligence suit against Harbor View,
alleging that the nursing home had breached the applicable standard of care by failing to
properly monitor Ms. Apusen's eye injury. (6) Harbor View answered with a general denial.

 On February 19, 2007, the Apusens provided Harbor View with an expert report
from Perry Starer, M.D., of New York City. Dr. Starer completed a fellowship in geriatrics
at the Mount Sinai School of Medicine in New York in 1985, received board certification in
this field in 1988 (and recertification in 1999), and has served as a professor of geriatric
medicine since 1985. His curriculum vitae reveals that he is the author or co-author of
twenty-one peer-reviewed articles, two textbook chapters, two book reviews, and three
abstracts. Nearly every one of his writings deals with topics pertaining to medical care of
the elderly. The expert report opined, in part:

If timely diagnosed, this type of infection is, more likely than not, treatable. 
In my opinion, had it been appropriately treated in a timely manner, Ms.
Apusen would have recovered from her infection. However, because it was
not appropriately treated in a timely manner, Ms. Apusen went on to
experience septicemia and death.


. . . . 


The standard of care is to monitor for signs and symptoms of
infection/septicemia in the patient and to provide prompt treatment. It is my
opinion that the deviation from the standard of care led to septicemia with the
consequence that Ms. Apusen's body was unable to overcome these
conditions which ultimately led to her death.


 On March 12, 2007, Harbor View filed a motion to dismiss for failure to comply with
chapter 74 expert report requirements. See Tex. Civ. Prac. & Rem. Code Ann. §§ 74.351,
74.402. In the motion, Harbor View argued that (1) Dr. Starer was not qualified to render
an opinion regarding standards of care in a nursing home because he specialized in
geriatrics, not nursing home care; and (2) the opinions presented within the "four corners"
of Dr. Starer's expert report failed to establish a causal link between Harbor Care's alleged
negligence and Ms. Apusen's death.

 On April 27, 2007, the court held a hearing on Harbor View's motion to dismiss. At
the hearing, the Apusens first argued that Dr. Starer's lack of experience in nursing home
care was unimportant because Dr. Starer is experienced in geriatrics, a field that is
substantially similar to nursing home care and which would qualify him to offer opinions on
the standard of care in nursing homes.

 The Apusens also contested Harbor View's argument that the report had not
sufficiently established causation. Harbor View's counsel argued that the expert report
failed to establish causation because Dr. Starer had made an unfounded assumption that
the failure to treat Ms. Apusen's eye injury was the cause of the septicemia. This
conclusory assumption, Harbor View argued, did not sufficiently explain what happened
during the one month between Ms. Apusen's admission to the hospital and her death. The
trial court, however, disagreed, stating on the record that cardiogenic shock "occurs
sometimes when they all--this proliferates the system . . . . That [one month gap] is what
causes the abscess to grow in the system and proliferate. The month is the generation of
the toxins and the infection." Harbor View protested that this statement by the trial
court--whether or not it was accurate--constituted an impermissible departure from the
"four corners" of the expert report.


 On July 11, 2007, the trial court issued a written order denying Harbor View's motion
to dismiss. Harbor View now appeals. (7)

II. Standard of Review

 A trial court's denial of a motion to dismiss based on the sufficiency of an expert
report is reviewed for abuse of discretion. Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 875 (Tex. 2001). An abuse of discretion occurs when a trial
court acts in an unreasonable and arbitrary manner or when it acts without reference to any
guiding principles. Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992). This does not
mean that we may reverse a trial court's ruling on the sufficiency of an expert report merely
because we may have decided the matter differently. See id. at 840. Instead, we review
whether the trial court could have reasonably determined that the report represented a
good faith effort to comply with the expert report requirements set forth in chapter 74 of the
civil practice and remedies code. See Palacios, 46 S.W.3d at 880.

 An expert report must provide a fair summary of the expert's opinions regarding
applicable standards of care, the manner in which the care rendered by the physician or
health care provider failed to meet the standards, and the causal relationship between that
failure and the injury claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). A "fair
summary" is not a full statement of the applicable standard of care and how it was
breached; it is merely an explanation of the care that was reasonably expected and not
given. Palacios, 46 S.W.3d at 880. "A plaintiff need not present evidence in the report as
if it were actually litigating the merits. The report can be informal in that the information in
the report does not have to meet the same requirements as the evidence offered in a
summary-judgment proceeding or at trial." Id. at 879.

 Finally, "because the statute focuses on what the report discusses, the only
information relevant to the [appellate] inquiry is within the four corners of the document." 
Id. at 878.

III. Analysis

 Harbor View's two challenges to the expert report are (1) that Dr. Starer is
unqualified to opine on the standard of care in nursing homes; and (2) even if he was
qualified, his report did not adequately establish a causal link between Harbor View's
alleged negligence and Ms. Apusen's death. We do not believe, however, that Harbor
View has demonstrated that the trial court's decisions on these issues were an abuse of
discretion.A. Dr. Starer's Qualifications An expert who gives opinion testimony regarding whether a health care provider
departed from accepted standards of health care must be qualified to testify under section
74.402 of the civil practice and remedies code. Tex. Civ. Prac. & Rem. Code Ann. §
74.351(5)(B). This means that the expert is qualified if he/she is "board certified or has
other substantial training or experience in the area of medical practice relevant to the claim;
and is actively practicing medicine in rendering medical care services relevant to the claim." 
Tex. Civ. Prac. & Rem. Code Ann. § 74.402(c).

 The statute, reasonably construed, does not require that the expert be involved in
the exact same field as the health-care-provider defendant; it merely requires that the
expert have the "'knowledge, skill, experience, training, or education' regarding the specific
issue before the court which would qualify the expert to give an opinion on that particular
subject." Roberts v. Williamson, 111 S.W.3d 113, 121 (Tex. 2003) (quoting Broders v.
Heise, 924 S.W.2d 148, 152 (Tex. 1996)). In Roberts, for example, a physician who was
board-certified in pediatrics, but not neurology, was nevertheless permitted to offer expert
opinions on neurological injuries because the particular issue in the case involved a
pediatric neurological injury, which was a particular area of pediatrics in which the expert
had demonstrated considerable knowledge and experience. Id.

 This means that "a qualified expert in a similar field may testify as to the accepted
standards of care if he can demonstrate within the report that he possesses knowledge
about the 'care or treatment delivered by the defendant' and the 'diagnosis, care or
treatment of the condition involved in the claim.'" Wissa v. Voosen, 243 S.W.3d 165, 170
(Tex. App.-San Antonio 2007, pet. denied) (quoting § 74.402(b)) (emphasis added); see
also Mem'l Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 760-62 (Tex.
App.-Houston [14th Dist.] 2007, no pet.); Foster v. Zavala, 214 S.W.3d 106, 114 (Tex.
App.-Eastland 2006, pet. filed); Group v. Vicento, 164 S.W.3d 724, 731 (Tex.
App.-Houston [14th Dist.] 2005, pet. filed); Methodist Health Care Sys. of San Antonio,
Ltd. v. Rangel, No. 04-05-00500-CV, 2005 Tex. App. LEXIS 10858, at *6 (Tex. App.-San
Antonio Dec. 14, 2005, pet. denied) (mem. op.) ("A medical witness who is not of the same
school of practice may be qualified to testify if he or she has practical knowledge of what
is usually and customarily done by other practitioners under circumstances similar to those
that confronted the defendant charged with malpractice.").


 The essential claim in this case concerns the standard of care that should be
applied in nursing homes, which are facilities where elderly and infirm persons reside. 
Thus, the relevant question is not the narrow issue of whether Dr. Starer has worked in a
nursing home, it is the broader issue of whether he is knowledgeable about the standard
of care applicable to elderly and infirm persons. On this point, Dr. Starer, by citing his
extensive experience in the field of geriatrics, certainly demonstrates within his report that
he possesses knowledge about the "care or treatment delivered by the defendant" and the
"diagnosis, care or treatment of the condition involved in the claim." Wissa, 243 S.W.3d
at 170.

 According to his expert report, Dr. Starer's fellowship, which he completed at the
Mount Sinai School of Medicine in New York, was in the field of geriatrics. He is board
certified in geriatrics. Since 1985, he has served as the Chief of the Geriatrics Section at
City Hospital at Elmhurst in New York. Additionally, he served as an attending physician
at a long-term care facility (the Jewish Home and Hospital for the Aged) between 1985 and
1999. Dr. Starer's experience in daily practice is also buttressed by experience in
academia. For nearly twenty-three years, he has served as a professor of geriatric
medicine.

 Harbor View questions how this knowledge of geriatrics is related to knowledge of
nursing home care, but that question is answered merely by a cursory glance at Dr.
Starer's publications, which include titles such as, "Sequential outbreak of influenza A and
B in a nursing home"; "Medical care of the elderly in the nursing home"; "The association
of incontinence and mortality in elderly nursing home patients"; and "Care of the nursing
home patient." This is but a sampling of his published papers, which in the aggregate,
exhibit a lengthy engagement with elderly care issues throughout his career.

 The facts in the instant case are analogous to the facts in Cresthaven Nursing
Residence v. Freeman, 134 S.W.3d 214, 233-34 (Tex. App.-Amarillo 2003, no pet.). In
Freeman, a physician who practiced occupational medicine was found qualified to opine
on nursing home care under section 74.402, not because he was knowledgeable about
nursing home care per se, but because he was knowledgeable about the type of injury that
the nursing home patient had suffered--a urinary tract infection--and how it would affect
the patient. Id. Dr. Starer is similarly situated. He may not have spent his entire career
working in nursing homes--although it is worth noting that he spent fourteen years working
at a long-term care facility in New York--but his curriculum vitae demonstrates that he is
knowledgeable about the types of people who reside in nursing homes, their afflictions,
and most importantly, the relevant treatment and standard of care for such patients.

 Thus the trial court did not abuse its discretion in finding that Dr. Starer was qualified
to opine on the standard of care at Harbor View, and we must reject Harbor View's first
issue.

B. The Adequacy of Dr. Starer's Causation Opinion

 Harbor View next argues that even if Dr. Starer were professionally qualified to
opine on nursing home standards of care, his expert report is inadequate because it fails
to provide a fair summary of the causal relationship between Harbor View's alleged
negligence and Ms. Apusen's death. See Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(6). Specifically, Harbor View argues that the report, within its "four corners," does
not directly explain how the nursing home's failure to monitor and treat Ms. Apsuen's eye
injury caused her death by cardiogenic shock. Harbor View also argues that the trial
court's finding that the causation analysis was sufficient relied upon impermissible
inferences. We disagree.

1. Causation is Demonstrated Within the Four Corners of the Expert Report


 Expert reports must provide the expert's opinions as to "the manner in which the
care rendered by the . . . health care provider failed to meet the standards [of care], and
the causal relationship between that failure and the injury, harm, or damages claimed." Id.
§ 74.351(r)(6). The expert report must not be conclusory in its explanation of causation;
it must provide "sufficient specificity to inform the defendant of the conduct the plaintiff has
called into question and to provide a basis for the trial court to conclude that the claims
have merit." Palacios, 46 S.W.3d at 875; Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002). This does not mean that a report's adequacy depends upon any particular
"magic words." Bowie Mem'l Hosp., 79 S.W.3d at 53; Gallardo v. Ugarte, 145 S.W.3d 272,
277 (Tex. App.-El Paso 2004, no pet.).

 The expert must provide bases for his statements and link conclusions to facts. 
Palacios, 46 S.W.3d at 875. The causation analysis must be contained within the "four
corners" of the report, and a trial judge is not permitted to make inferences beyond the four
corners. Patel v. Williams, 237 S.W.3d 901, 905 (Tex. App.-Houston [14th Dist.] 2007, no
pet.).

 In the instant case, we do not believe the trial court abused its discretion when it 
found that Dr. Starer's report satisfied the above criteria. To begin, Dr. Starer provided
reasonable bases for his opinions by explaining that he learned about the facts of the case
from Ms. Apusen's medical records and death certificate and that he applied
methodologies which are employed by all physicians in both lawsuits and in peer-review
settings. The text of his report provided a fair summary of the standard of care by
explaining that when an elderly patient has an eye injury such as Ms. Apusen's, she is at
unique risk for infection, sepsis, and eventually death, and therefore the "standard of care
is to monitor for signs and symptoms . . . and to provide prompt treatment." Next, the
report explained that this standard was presumably unmet, as indicated by daily empty
spaces in the medical records where descriptions of her condition and results of blood
tests would ordinarily appear. Dr. Starer's report states that on three consecutive days
following the critical injury, "there is no description of Ms. Apusen's right eye in the Nursing
Notes." Nor, the report continues, is there any indication in the records that Ms. Apusen
was administered gentamycin drops on the day they were first prescribed.

 Finally, Dr. Starer's report asserted causation by explaining that Harbor View's
inattention to Ms. Apusen allowed septicemia to develop "with the consequence that Ms.
Apusen's body was unable to overcome these conditions which ultimately led to her death." 
Dr. Starer also wrote about the seriousness of orbital abscesses, explaining that "intensive
antibiotic therapy" and "frequent monitoring of systemic and oracular parameters is
essential." Dr. Starer then expressed his ultimate conclusion thus:

The standards of care in this situation are clear and they were not followed. 
If timely diagnosed this type of infection [septicemia] is more likely than not,
treatable. In my opinion, had it been appropriately treated in a timely
manner, Ms. Apusen would have recovered from her infection. However,
because it was not appropriately treated in a timely manner, Ms. Apsuen
went on to experience septicemia and death.


 This language is strikingly similar to language in an expert report that was recently
approved by the El Paso Court of Appeals. Gallardo, 145 S.W.3d at 279. In Gallardo, the
estate of a deceased nursing home patient sued the nursing home, alleging that it was
negligent in not properly monitoring and treating a decubitus ulcer which eventually led to
the death of the patient. Id. at 274. The expert report offered by the plaintiff in Gallardo
concluded that:

More frequent checks by the CNA to insure he maintained a position change
every two hours, padding his bed in such a manner as to maintain him in
position and Granulex spray to pressure points are but a few of the things
that . . . could have been done to prevent as well as treat the decubitus.
There is no evidence in the record that Mr. Gallardo received any of these
preventive measures.


. . . .


Mr. Gallardo should have been placed on oxygen and a call to 911 should
precede the call to Dr. Ugarte. Please note, Dr. Ugarte does not evaluate this
incident or address it in his Progress Notes.


. . . .


Dr. Ugarte failed to meet the standard of care to accurately assess and
diagnose Mr. Gallardo, to prescribe medications consistent with Mr.
Gallardo's diagnoses and current prescribing standards, to prescribe an
accurate dose of medication to treat the condition for which it was
prescribed, to prescribe an appropriate medication, to provide treatment
consistent with Mr. Gallardo's diagnosises and medical conditions and to
follow established protocols and guidelines of nursing home and the State
of Texas. . .


Gallardo, 145 S.W.3d at 279.

 In both the instant case and in Gallardo, the principle that emerges is that an expert
report provides a "fair summary" of causation if it explicates what a nursing home (or
physician) should have done but did not do, and then it explains that the inattention caused
otherwise treatable medical conditions to become fatally unmanageable. Id. at 280 (finding
that the report "addresses causation by indicating that if the proper steps had been taken,
the decubitus [ulcer] could have been prevented or at least could have been prevented
from progressing"); see also Sides v. Guevara, No. 08-06-00213, 2007 Tex. App. LEXIS
7064, *17-18 (Tex. App.-El Paso Aug. 30, 2007, no pet.) (citing Gallardo, 145 S.W.3d at
279). The Gallardo court further emphasized that, "although the statement does not use
the word 'causation,' the words 'could have been done to prevent as well as treat the
decubitus' adequately convey the idea that failure to take the proper steps caused the
decubitus or caused it to get worse." Id. at 280. Applying this same analysis to the instant
case, it seems apparent to us that the trial court's finding that Dr. Starer's report provided
a fair summary of causation was not an abuse of discretion.

 Harbor View contends that this Court should find in its favor in light of our holding
in Meyers v. Golden Palms Retirement & Health Ctr., Inc., No. 13-06-289-CV, 2007 Tex.
App. LEXIS 4098 (Tex. App.-Corpus Christi May 24, 2007, pet. denied) (mem. op.). We
believe, however, that Meyers is inapposite. In Meyers, a nurse assistant in a retirement
center moved an elderly patient from a wheelchair to a hospital bed, even though,
according to internal procedures at the retirement center, the patient should have been
moved by two nurses, not just one. Id. at *1-2. The patient injured her femur, and she
sued the retirement center. Id. at *2. The plaintiff's expert report stated that the one-person removal violated internal policy, but the report did not state that the femur injury
could have been avoided with a two-person removal. Id. at *7. The trial court found this
explanation of causation insufficient and dismissed. Id. at *1. We affirmed. Id. at *16.

 Harbor View suggests that the situation in the instant case is analogous to the
situation in Meyers and, therefore, in order to be consistent in our jurisprudence in this
area, we must now reverse. We believe, however, that Harbor View misreads Meyers. 
Meyers evaluated whether the trial court had abused its discretion; it was not a de novo
review of the adequacy of the causation analysis linking the patient's removal to her femur
injury. Id. at *5. Indeed, our opinion explained that we had significant doubts about the
trial court's assessment, but we recognized that we were not charged with re-hearing the
facts. Id. at *13. Rather, we were charged with assessing whether the trial court had
abused its discretion. Id. The following language from Meyers is critically important:

The report does not state that the incident would have been avoided had
there been a two-person transfer. The expert did not explain how the
purported negligence caused the broken leg, nor does the report mention
that the broken leg would not have occurred had she been transferred by two
persons. The report does not flesh out how the failure to comply with the
MDS caused the injuries. Although we might have decided the issue
differently, we cannot say that the trial court acted contrary to guiding Texas
law, particularly because the case law affords discretion.


Id. (emphasis added). We further explained that "[d]iscretion, at its most basic level,
means choice. Trial court discretion is important because it is impossible for appellate
courts to monitor all trial court rulings in a precise manner because the facts and
circumstances are so varied." Id.

 We stand by that language, and absent any evidence that a trial court acted in an
unreasonable and arbitrary manner or that it acted without reference to any guiding
principles, we may not hold that it abused its discretion. Walker, 827 S.W.2d at 839. In
the instant case, the trial court appears to have acted in deference to the guiding principles
about causation analysis which are enunciated in Gallardo. Gallardo, 145 S.W.3d at 279. 
Thus, we cannot find that the trial court abused its discretion.

2. The Trial Court Did Not Rely Upon Improper Inferences


 Finally, Harbor View argues that the trial court abused its discretion by making an
improper inference about causation that was not within the "four corners" of the expert
report. Specifically, Harbor View alleges that the expert report failed to address a "one-month gap" between the point at which Ms. Apusen's eye abscess was treated on April 14
and her death due to cardiogenic shock on May 10. Thus, Harbor View argues that the
trial court's comment regarding that month constitutes an impeachable inference. (8) We
disagree.

 In Palacios, the supreme court specifically ruled that although an expert report
needed to be a "fair summary," a fair summary was not a "full statement of the applicable
standard of care and how it was breached." Palacios, 46 S.W.3d at 879. This implies that
there is some level of ambiguity--something less than an absolutely full description--that
is subject to the independent analysis of the trial court. Tovar v. Methodist Healthcare Sys.
of San Antonio, Ltd., L.L.P., 185 S.W.3d 65, 68 (Tex. App.-San Antonio 2005, pet. denied)
("[A] fair summary is something less than all the evidence necessary to establish causation
at trial").

 In the instant case, when the trial court commented on the cause of Ms. Apusen's
toxic shock, it stated that the one-month "gap," which Dr. Starer did not address in his
expert report, was the time which "causes the abscess to grow in the system and
proliferate." The reporter's record reveals that these comments were intended as an
explanation of concepts which were mentioned, but not defined, within Dr. Starer's report. 
Thus, the trial court's explanation was only beyond the "four corners" of the report in the
sense that the trial court explained medical concepts--such as abscess and cardiogenic
shock--which Dr. Starer did not explain. The trial court, however, did not propose unique
causation theories that were not discussed in the expert report.


 We believe that Dr. Starer's report, which explained causation, but which did not
explain certain medical concepts that would perhaps need to be explained at trial, was
"less than all the evidence necessary to establish causation at trial," but still provided a "fair
summary" of causation. See id. at 68. We further believe the trial court's comments about
the one-month gap were merely more detailed explanations of the expert report's concepts,
not inferences. Harbor View provides no citations otherwise. The trial court's comments
were not an improper "inference" and do not constitute an abuse of discretion.

IV. Conclusion

 We find that the trial court did not abuse its discretion in finding either that Dr. Starer
was qualified to opine on nursing home standards of care or that his expert report
satisfactorily addressed causation under chapter 74. We thus reject Harbor View's claim
that it is entitled to attorneys' fees and court costs under chapter 74. See Tex. Civ. Prac.
& Rem. Code Ann. § 74.351(b)(1). We AFFIRM the judgment of the district court.


 

 _____________________________

 GINA M. BENAVIDES,

 Justice


Memorandum Opinion delivered and

filed this the 24th day of April, 2008.

1. The heirs are Rudy G. Travis, David K. Travis, and Manuel K. Apusen, Jr. 
2. Purulent means containing, consisting of, or being pus. Merriam-Webster OnLine Dictionary,
http://www.merriam-webster.com/dictionary/purulent (last visited March 26, 2008). 
3. Edema is an abnormal infiltration and excess accumulation of serous fluid in connective tissue or
in a serous cavity. Merriam-Webster OnLine Dictionary, http://www.merriam-webster.com/dictionary/edema
(last visited March 26, 2008).
4. Erythema is an abnormal redness of the skin due to capillary congestion. Merriam-Webster
OnLine Dictionary, http://www.merriam-webster.com/dictionary/erythema (last visited March 26, 2008).
5. Cardiogenic shock is characterized by a decreased pumping ability of the heart that causes a
shocklike state, http://www.emedicine.com/EMERG/topic530.htm (last visited March 26, 2008).
6. The Apusens also filed suit against Dr. Almanza, the physician who originally prescribed gentamycin
drops to treat Ms. Apusen's eye condition, but he is not a party to this appeal.
7. We have jurisdiction to review a trial court's denial of a motion to dismiss based on an allegedly
deficient expert report in a health-care liability claim where, as here, the trial court has not concurrently granted
a one-time extension allowed under section 74.351(c) to cure alleged deficiencies. Lewis v. Funderburk, No.
06-0518, 2008 Tex. LEXIS 312, at *5-8 (Tex. April 11, 2008); see Ogletree v. Matthews, No. 06-0502, 2007
Tex. LEXIS 1028, at *16 (Tex. Nov. 30, 2007) (holding that "[n]o interlocutory appeal is permitted when a
served expert report is found deficient and an extension of time granted.").
8. The trial court stated that the month-long gap is "what causes the abscess to grow in the system and
proliferate; the month is the generation of the toxins and the infection."