*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★ ★ ★ ★

# OPINION

No. 04-08-00277-CV

Enrique F. **BENAVIDES**, Jr., M.D.,
Appellant

v.

Jorge R. **GARCIA**,
Individually And As Legal Representative Of The Estate Of Annabel De Jesus Garcia;
And Jorge R. Garcia As Next Friend Of Ana Victoria Garcia,
Appellees

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2007-CVQ-000599-D1
Honorable Jose A. Lopez, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Sandee Bryan Marion, Justice

Delivered and Filed:   January 7, 2009

AFFIRMED

This is an appeal from the trial court's denial of appellant's motion to dismiss appellees'

health care claim on the grounds that (1) the expert report was not authored by a qualified expert and

(2) the report does not set out the causal connection between the alleged breach and the alleged

injury. We conclude the trial court did not abuse its discretion in denying the motion to dismiss and

we affirm.

## BACKGROUND

In the underlying obstetrics malpractice lawsuit, appellee, Jorge Garcia, alleged appellant misdiagnosed his wife, Annabel de Jesus Garcia, with gestational hypertension, although she actually suffered from preeclampsia which led to her cardiac arrest and ultimate death as well as the fetal distress suffered by her daughter, Ana Victoria Garcia. On behalf of himself, his wife's estate, and his daughter, Garcia later sued Laredo Womens' Center ("LWC") and appellant, Dr. Enrique F. Benavides, Jr. who was Annabel's gynecologist and obstetrician.

Garcia timely served Benavides and LWC with an expert report pursuant to Texas Civil Practice and Remedies Code section 74.351. Benavides and LWC objected to the report and moved to dismiss on the grounds that Garcia's expert was not qualified and the report failed to set forth the standard of care, identify any breach of the standard of care, and establish causation. The trial court granted a dismissal in favor of LWC, but allowed Garcia an extension of time to file an amended report as to Benavides.

Garcia served Benavides with an amended expert report. Benavides again objected and moved for dismissal on the grounds that Garcia's expert was not qualified and the report failed to identify and explain a causal link between any alleged breach of the standard of care and the alleged injuries. After a hearing on the objections, the trial court denied Benavides's motion to dismiss and this appeal ensued.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to dismiss a case under section 74.351(l) for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875

(Tex. 2001). A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to any guiding rules and principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985).

## EXPERT QUALIFICATION

Benavides asserts Garcia's expert, Dr. Vernie D. Bodden, is not qualified to render an opinion regarding the standard of care because (1) Dr. Bodden does not state in his report or curriculum vitae that he is so qualified, and (2) Dr. Bodden is not "actively practicing medicine in rendering medical care services relevant to the claim either at the time of his report or at the time of the care and treatment made the basis of the underlying lawsuit." In his report, Dr. Bodden states his qualifications as follows:

> . . . I am presently practicing Locum Tenens Obstetrics and Gynecology. I am a board certified OB-GYN who conducted an active practice in Dallas, Texas for 28 years. During that time I was involved in resident training at both Baylor University Medical Center and Presbyterian Hospital of Dallas. I also participated in resident training for three years at Parkland Memorial Hospital during the early years of my practice. As a board certified Obstetrician and Gynecologist I have been trained to manage "high risk" pregnancies that, at times requires the consultation of a perinatologist (maternal-fetal medicine specialist). During the last few years of my private practice I had the opportunity to perform the in-hospital admission, management, and delivery of "high-risk" pregnancies for one of the perinatal groups (maternal-fetal medicine) at Presbyterian Hospital of Dallas.

A person may qualify as an expert witness on whether a physician departed from the standard of care only if that person: (1) is a physician who is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of the accepted standards of care involved in the case; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM.

CODE ANN. § 74.401(a) (Vernon 2005). In addition, the court must consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim, and is actively participating in rendering medical care relevant to the claim. *Id.* at § 74.401(c).

Nothing in section 74.401 supports Benavides's contention that a locum tenens physician is unqualified to render an expert opinion. The term "locum tenens" is defined as a "[p]hysician who substitutes for another temporarily." TABER'S CYCLOPEDIC MEDICAL DICTIONARY L-38 (10th ed. 1965); *see also* BLACK'S LAW DICTIONARY 959 (8th ed. 2004) (defining term as "A deputy; a substitute; a representative."). Section 74.401 does not exclude locum tenens physicians from acting as experts, nor does it limit experts to only those physicians engaged in "private practice." Instead, for purposes of section 74.401, "'practicing medicine' or 'medical practice' includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians." TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(b). We believe allowing a locum tenens physician to act as an expert is not inconsistent with allowing consultants and teachers to act as experts.

Dr. Bodden's report and curriculum vitae demonstrate he is a licensed and board certified physician practicing medicine during the requisite time period; he has knowledge of accepted standards of care for the diagnosis, cure, or treatment of the illness or condition involved in the underlying claim; and he has had the opportunity to manage "high risk" pregnancies such as Annabel's. Based on Dr. Bodden's report and curriculum vitae, we conclude the trial court did not

abuse its discretion in determining he qualified as an expert on whether Benavides departed from the standard of care and on the issue of causation.

## CAUSAL LINK

Benavides next asserts Dr. Bodden's report did not establish a causal link because Dr. Bodden only speculated as to what might have happened if Annabel had been hospitalized earlier in her pregnancy. Benavides contends Dr. Bodden's opinion that Annabel's preclampsia would have been treated and it is more likely than not that she would not have died had Benavides hospitalized her is based not on any facts, but on mere conjecture. Benavides also contends Dr. Bodden's report does not address the infant's injuries; therefore, the report is not sufficient to establish causation as to the child's injuries. We disagree with Benavides' contentions.

A plaintiff who brings a health care liability claim is required to file an expert report that contains "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2008); *see also Tovar v. Methodist Healthcare Sys. of San Antonio,* 185 S.W.3d 65, 67 (Tex. App.—San Antonio 2005, pet. denied).

If the report does not constitute a good faith effort to comply with the statutory requirements, then the trial court shall dismiss the lawsuit. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(2). In determining whether the expert report constitutes a good faith effort, we look no further than the report itself. *Palacios,* 46 S.W.3d at 878 (the only information relevant to the inquiry is within "the

four corners" of the report). The report need not marshal all of the plaintiff's proof; however, it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Id.* at 878; *Tovar,* 185 S.W.3d at 68. A plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. The report can be informal in that the information in the report does not have to meet the same requirement as the evidence offered in a summary judgment proceeding or at trial. *Id.* On the other hand, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002).

Annabel Garcia was thirty years old, obese, and a type II diabetic. In his report, Dr. Bodden tracked Annabel's treatment by Benavides, beginning with her initial visit on May 4, 2006. At this time, Annabel was seven weeks pregnant, she weighed 207 pounds, her blood pressure was 132/70, and she had a 1+ proteninuria.[1] Dr. Bodden noted she was recognized as deserving a "high risk" status. Over the next three months, Annabel gained twelve pounds, which was within normal limits, and she maintained normal blood pressure with no significant proteinuria. On August 24, 2006, Annabel's blood pressure was 126/86, she had a 2+ proteinuria, and no lab tests or precautions were documented. On September 11, 2006, Annabel's blood pressure was 140/88, she had a 3+ proteinuria, and no lab tests or precautions were documented. On September 26, 2006, Annabel's blood pressure was 140/90 to 144/82, she had a 4+ proteinuria, and no lab tests or precautions were documented. In his review of the medical records, Dr. Bodden noted that "despite the significant proteinuria and abnormal blood pressure no other tests were ordered, no discussion with the patient

---

[1] Proteinuria is defined as "[p]rotein, usually albumin, in the urine." TABER'S CYCLOPEDIC MEDICAL DICTIONARY P-111.

was documented, and no concerns were expressed." Dr. Bodden stated Annabel "continued to demonstrate significant proteinuria and finally developed abnormal blood pressure of 140/90 on 9/26/06. The standard of care would require a diagnosis of preeclampsia. The clinical picture was beginning to unfold and standard measures of evaluation were neglected."

By October 3, 2006 Annabel had gained five pounds over a one-week period, her blood pressure was 148/90, she had a 1+ proteinuria, and she complained of decreased fetal movement. On October 9, 2006, Annabel presented to Benavides's office with "sinus symptoms," her blood pressure was 180/98, she had gained four pounds since her last visit, and she had a 4+ proteinuria. Benavides started Annabel on twice-daily blood pressure medication, and three days later her blood pressure was 132/76, she had a 1+ proteinuria, and a one-pound weight gain. A test of the amniotic fluid was normal and there was normal fetal growth with no obvious abnormalities.

On October 10, 2006, Annabel returned to Benavides with a six-pound weight gain over four days, her blood pressure was 160/98, and she had a 4+ proteinuria. On October 26, 2006, she presented with a cough attributed to her allergies, her blood pressure was 148/100, and she had a 4+ proteinuria. By October 30, 2006, Annabel had gained another six pounds, she had a persistent cough, and her blood pressure was 136/80. By November 9, 2006, she was complaining of vomiting and feeling "hot inside her abdomen." However, no other instructions or concerns were documented. Annabel did not again return to Benavides's office.

Instead, on November 13, 2006, Annabel presented to Doctor's Hospital of Laredo complaining of contractions and back pain, she was coughing foamy sputum, and she experienced what was described as a seizure. Annabel went into cardiopulmonary arrest, a known complication

of preclampsia and eclampsia, and resuscitation efforts resulted in a "poor response." Dr. Bodden's report continues: "[t]he physician in charge of the resuscitation attempts felt that delivery of the baby was indicated due to the likelihood that the mother was not going to survive. Cardiopulmonary resuscitation was continued throughout the emergency cesarean section and Mrs. Garcia was declared dead after the operation."

In his report on causation, Dr. Bodden repeatedly states that Benavides's failure to follow the standard of care was a direct and proximate cause of Annabel's severe untreated preeclampsia, eclampsia, and death from cardiorespiratory arrest, as well as the "traumatic delivery of the infant Ana Victoria Garcia." Dr. Bodden stated that "Mrs. Garcia and her baby tolerated months of preeclamptic stress. In Mrs. Garcia's case the condition progressed slowly allowing her physician multiple opportunities to make the right decision. As stated previously the only cure for preeclampsia is delivery."

When read in isolation, Dr. Bodden's opinion appears to be conclusory; however, the trial court was permitted to read the causation section in the context of the entire report. *See Cooper v. Arizpe*, No. 04-07-00734-CV, 2008 WL 940490, at *2-3 (Tex. App.—San Antonio Apr. 9, 2008, no pet. h.) (mem. op., not designated for publication). Dr. Bodden stated that on September 26, the standard of care required a diagnosis of preeclampsia. On October 9, the standard of care required a diagnosis of severe preeclampsia and that Annabel be admitted to the hospital for the complete evaluation and surveillance of both mother and fetus. Dr. Bodden continued:

> . . . A consultation with a maternal-fetal medicine specialist or a phone call to the nearest tertiary center would have been appropriate. Instead, Dr. Benavides chose to treat Mrs. Garcia with antihypertensive medication. This medication may have lowered her blood pressure but it did not alter the pathophysiologic changes of

preeclampsia. There are physicians who treat severe preeclampsia conservatively; however, this therapy is considered controversial and MUST be carried out in a tertiary perinatal center. This allows for daily fetal biophysical profiles, blood pressures every 4-6 hours, complete blood count and platelet count daily, liver function studies every 3-4 days, and immediate attention to the patient's complaints. The condition of a patient with preeclampsia can change over a matter of hours with catastrophic results as it did in this case. Close surveillance is mandatory. Dr. Benavides failed to diagnose preeclampsia, failed to obtain the required testing that would have guided further treatment, and failed to admit Mrs. Garcia to the hospital for close observation and treatment.

Because Dr. Benavides did not diagnose severe preeclampsia and admit Mrs. Garcia to a hospital on 10/09/06 she did not receive the care that a patient in similar circumstances would normally receive, as outlined above, from a reasonably prudent physician. Had Mrs. Garcia been admitted to hospital on 10/09/06 it is more likely than not that changes in her medical condition would have been detected well prior to the development of eclampsia and cardiorespiratory arrest. The failure of Dr. Benavides to follow the standard of care was a direct and proximate cause of Mrs. Garcia's developing severe untreated preeclampsia, and death from cardiorespiratory arrest.

Dr. Bodden then examined the repercussions of Dr. Benavides's failure to follow the standard of care on November 9, 2006:

. . . After 9/26/06 Mrs. Garcia began gaining weight at a significant rate. Her 4+ proteinuria persisted and mild liver enzyme elevations were documented. The standard of care would have required in-hospital evaluation and observation. The "cough" that was attributed to sinus problems was, in all medical probability more likely than not the first sign of pulmonary edema. . . . A prudent conservative and concerned OB-GYN would have taken the entire clinical picture into consideration. After all it was agreed that Mrs. Garcia was a high-risk pregnancy and as such at risk for the problems previously discussed. The standard of care required that Dr. Benavides admit Mrs. Garcia to a hospital once she demonstrated signs and symptoms of preeclampsia and severe preeclampsia. Had Mrs. Garcia been admitted to the hospital on 11/09/06 it is more likely than not that changes in her medical condition would have been detected and reported to the physician well prior to the development of eclampsia and cardiorespiratory arrest. The failure of Dr. Benavides to follow the standard of care was a direct and proximate cause of Mrs. Garcia's developing severe untreated preeclampsia, eclampsia and death from cardiorespiratory arrest.

. . .

Mrs. Garcia was demonstrating signs of impending problems from 9/11/06 till the time of her last visit on 11/9/06. The medical evidence in this case overwhelmingly supports the diagnosis of preeclampsia and eclampsia and it is more likely than not that Mrs. Garcia's death could have been avoided by admission to a hospital and an early delivery, but for the failure of Dr. Benavides to follow the standard of care it is more likely than not that Mrs. Garcia would have survived. Mrs. Garcia gave her physician two months to make a decision. Because Dr. Benavides failed to follow the standard of care Mrs. Garcia and her infant . . . suffered continued stress from the pathophysiologic changes of preeclampsia which continued untreated and unevaluated for months prior to her death that resulted directly from the manifestations of preeclampsia, severe preeclampsia, and eclampsia.

. . . Had Mrs. Garcia been admitted to the hospital, in all medical probability it is more likely than not that her blood pressure would have improved with bed rest or if it worsened it would have been detected and appropriately addressed. It is also more likely than not that abnormal fetal biophysical changes, or laboratory studies would have been detected while under close observation in hospital. Maternal symptoms and vital signs would have been documented and ominous findings addressed. In essence the physician would have been better able to evaluate Mrs. Garcia, prevent eclampsia from occurring and justify the need for a premature delivery.

At the time of Mrs. Garcia's last two prenatal visits on 11/06/06 and 11/09/06 she was 33.4 and 34 weeks pregnant respectively . . . . Delivery at this gestational age is associated with a greater than 98% survival and deterioration of the maternal and fetal condition could have been avoided. . . . Had the standard of care been non-negligently performed and had Dr. Benavides admitted Mrs. Garcia to the hospital on 11/06/06 or 11/09/06 and effected an elective delivery of the infant, which is the only cure for preeclampsia and severe preeclampsia, in all medical probability Mrs. Garcia would have survived and her infant would not have suffered prolonged anoxia and other injuries previously noted, due to the cardiopulmonary arrest and resuscitation. But for the failure of Dr. Benavides to follow the standard of care it is more likely than not that Mrs. Garcia would have survived.

As to the standard of care and the issue of causation regarding the injuries suffered by the infant, Dr. Bodden stated as follows:

. . . Further, the failure to treat preeclampsia and limit the fetal stressors resulted in prolonged fetal stress and culminated in a traumatic delivery of the infant Ana Victoria Garcia. Ana Victoria suffered cardiorespiratory depression at birth, respiratory syndrome requiring mechanical ventilation, sepsis requiring intravenous antibiotics and vasopressors, neonatal seizures, hypocalcemia, poor feeding and suspected global neurological deficit. . . . Later testing revealed a grade II intraventricular brain hemorrhage. These injuries sustained by Ana Victoria Garcia were the direct and proximate result of Dr. Benavides's failure to follow the standard of care by failing to diagnose preeclampsia and severe preeclampsia when Annabel Garcia met the criteria for that diagnosis.

We conclude Dr. Bodden links his conclusion that Benavides breached the standard of care by failing to diagnose preeclampsia and severe preeclampsia and by failing to timely admit Annabel to the hospital to his conclusion that these breaches of the standard of care led to Annabel's severe untreated preeclampsia, eclampsia and death from cardiorespiratory arrest, as well as the traumatic delivery and injuries sustained by Ana Victoria. Dr. Bodden explained the medical basis for his opinion that, if Benavides had not repeatedly breached the standard of care, "in all medical probability Mrs. Garcia would have survived and her infant would not have suffered prolonged anoxia and other injuries . . ., due to the cardiopulmonary arrest and resuscitation." We conclude Dr. Bodden's report put Benavides on notice of the complained-of conduct and provides a sufficient basis for the trial court to conclude that Garcia's claims against Benavides have merit. Therefore, the trial court did not abuse its discretion in denying Benavides's motion to dismiss.

## CONCLUSION

We affirm the trial court's judgment.[2]

Sandee Bryan Marion, Justice

---

[2] We decline to address Benavides's issue regarding his entitlement to attorney's fees under section 74.351(b) because it is rendered moot by our disposition of this appeal. TEX. R. APP. P. 47.1.