COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                NO.  2-09-288-CV

 

 

PRESBYTERIAN
COMMUNITY HOSPITAL                                      APPELLANTS

OF
DENTON D/B/A PRESBYTERIAN 

HOSPITAL
OF DENTON AND CHAD 

HAMMONDS,
R.N.

 

                                                             V.

 

CONNIE SMITH,
INDIVIDUALLY AND                                                APPELLEES

AS
PERSONAL REPRESENTATIVE OF 

THE
ESTATE OF THOMAS EDWARD 

SMITH,
DECEASED, AND AS NEXT 

FRIEND
FOR THOMAS ANTHONY 

SMITH,
A MINOR, AND DOUGLAS

SMITH
AND STEPHANIE SMITH

 

                                                       ------------

 

               FROM
THE 393RD DISTRICT COURT OF DENTON COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

I. 
Introduction








In
this interlocutory appeal, Appellants Presbyterian Hospital of Denton d/b/a
Presbyterian Hospital of Denton and Chad Hammonds, R.N. (collectively, the
Hospital) argue that the trial court abused its discretion by denying the
Hospital=s
motion to dismiss.  We affirm the trial
court=s
order. 

II. 
Procedural Background

Appellees
Connie Smith, Individually, and as Personal Representative of the Estate of
Thomas Edward Smith, Deceased, and as Next Friend for Thomas Anthony Smith, a
Minor, and Douglas and Stephanie Smith (collectively, the Smiths) sued the
Hospital on September 2, 2008.  The
Smiths asserted that the Hospital, by and through its nurse-employees, acted
negligently in its care and treatment of Thomas Edward Smith.  On December 31, 2008, the Smiths served the
Hospital with expert reports by Dr. Michael E. Halkos, a cardiothoracic
surgeon, and Dean W. Hayman, R.N., a registered nurse specializing in cardiac
and critical care nursing.  The Hospital
filed a motion to dismiss and argued Dr. Halkos=s
and Nurse Hayman=s expert reports do not meet
the statutory requirements because they do not constitute Aan
objective good faith effort to provide a fair summary of the alleged experts=
opinions on the standard of care, alleged breach thereof, and how any alleged
breach by [the Hospital] caused [the Smiths=]
damages.@  








After
a hearing, the trial court denied the Hospital=s
motion as to Dr. Halkos=s report.  The trial court partially denied and
partially granted the Hospital=s
motion as to Nurse Hayman=s report and granted the
Smiths an extension to supplement Nurse Hayman=s
report if they chose to do so.[1]  The Smiths then served the Hospital with a
supplemental report from Nurse Hayman, and the Hospital again objected.  After a hearing, the trial court overruled
the Hospital=s
objections to the supplemental report. 
This interlocutory appeal followed. 
See Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(9)
(Vernon 2008); Lewis v. Funderburk, 253 S.W.3d 204, 208 (Tex. 2008)
(authorizing appeal from trial court order determining that expert report was
adequate and denying motion to dismiss). 

III. 
Factual Background

The
Smiths=
fourth amended petition, their live pleading at the time of the second hearing
on the Hospital=s motion to dismiss,
contains the following allegations relevant to their claims against the
Hospital.








On
June 21, 2006, Mr. Smith presented to the emergency department at the Hospital
with intermittent headaches, feverishness, increasing malaise and shortness of
breath, minimal cough, shoulder and back pain, and leg swelling.  He was admitted to the Hospital for further
evaluation and treatment.  Tests revealed
Athe
presence of bilateral pneumonia and moderate renal compromise@ and
Asevere
tricuspid regurgitation with vegetations present.@  Mr. Smith=s
blood cultures were also positive for methicillin-sensitive Staphylococcus
aureus, and he was treated with intravenous antibiotics.

Because
of his diagnosis of tricuspid valve endocarditis, Mr. Smith Aunderwent
a tricuspid valve debridement and excision with tricuspid valve replacement@ on
June 30, 2006.  A transesophageal
echocardiogram at the end of the operative procedure Arevealed
good seating of the valve with no evidence of perivalvular leak, good function
of the valve leaflets and . . . no evidence of an atrial-ventricular block.@  Mr. Smith then returned to the intensive care
unit (the ICU) for further treatment and recovery. 

On
July 4, 2006, Mr. Smith had a Quinton catheter sutured into place in his left
internal jugular vein.  He tolerated the
procedure well, and all catheters in his body were Anoted
to be free of reddness [sic] or edema.@  However, Nurse Hammonds entered Mr. Smith=s
room on July 5, 2006, and found that Mr. Smith Awas
experiencing agonal respirations,@
that Athe
Quintan [sic] catheter was no longer in its proper place,@ and
that Mr. Smith Awas and had been
experiencing significant bleeding.@  The medical staff successfully resuscitated
Mr. Smith, and he remained in the ICU. 
Later that day, however, Mr. Smith Awas
medically assessed that he was not able to follow simple commands, except to
open his eyes when his name was called.@








Over
the next few days, Mr. Smith continued receiving blood pressure medications and
received a new Quinton catheter.  He
received dialysis therapy, but by July 8, 2006, his Ablood
pressure continued to drop despite increasing . . . his blood pressure
medications@ and
other treatments.  Mr. Smith also had Acontinuous
oozing of blood from his mouth, nose, hemodialysis catheter, and scrotal area.@  On July 9, 2006, Dr. Mario Ruiz informed Mr.
Smith=s
wife, Connie, that Mr. Smith was Aslowly
dying.@  On July 10, 2006, Aa
medical decision was made to withdraw life support measures from Mr. Smith due
to his severely [sic] brain damaged [sic] and other conditions, such life
support measures were withdrawn from Mr. Smith, and he was pronounced dead@ on
the evening of July 10, 2006.  An autopsy
by Dr. Juan Zamora Arevealed pathological
findings of a status post recent tricuspid valve prosthesis implant showing no
complications, hypertrophy of the heart (500g) with organizing fibrinoid
percarditis, bilateral granulomata of the lungs, edema of the brain with acute
hepatitis, and other findings.@ 

IV. 
Standard of Review








A
trial court=s
ruling concerning an expert report under section 74.351 (formerly article
4590i, section 13.01) of the Medical Liability and Insurance Act is reviewable
under the abuse of discretion standard. 
See Tex. Civ. Prac. & Rem. Code Ann. '
74.351; Bowie Mem=l
Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex.
2001).  To determine whether a trial
court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, we must
decide whether the act was arbitrary or unreasonable.  Cire v. Cummings, 134 S.W.3d 835, 838B39
(Tex. 2004).  An appellate court cannot
conclude that a trial court abused its discretion merely because the appellate
court would have ruled differently in the same circumstances.  Bowie Mem=l, 79
S.W.3d at 52; E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d
549, 558 (Tex. 1995).

V. 
Statutory Requirements

A
health care liability claimant must serve an expert report on each defendant no
later than the 120th day after the claim is filed.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(a).  A defendant may challenge the adequacy of a
report by filing a motion to dismiss, and the trial court must grant the motion
to dismiss if it finds, after a hearing, that Athe
report does not represent an objective good faith effort to comply with the
definition of an expert report@ in
the statute.  Id. '
74.351(l).  While the expert
report Aneed
not marshal all of the plaintiff=s
proof,@ it
must provide a fair summary of the expert=s
opinions as to the Aapplicable standard of care,
the manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.@  Id. ' 74.351(r)(6);
Palacios, 46 S.W.3d at 878 (construing former article 4590i, '
13.01).








To
constitute a good faith effort, the report must discuss the standards of care,
breach, and causation with sufficient specificity (1) to inform the defendant
of the conduct the plaintiff has called into question and (2) to provide the
trial court with a basis to conclude that the claims have merit.  See Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 879.  A report does not fulfill this requirement if
it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 879.  But the information in the report Adoes
not have to meet the same requirements as the evidence offered in a
summary-judgment proceeding or at trial.@  Palacios, 46 S.W.3d at 879.

When
reviewing the adequacy of a report, the only information relevant to the
inquiry is the information contained within the four corners of the
document.  Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 878.  This requirement precludes a court from
filling gaps in a report by drawing inferences or guessing as to what the
expert likely meant or intended.  See
Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279 (Tex. App.CAustin
2007, no pet.).  However, section 74.351
does not prohibit experts, as opposed to courts, from making inferences based
on medical history.  Marvin v. Fithian,
No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.CHouston
[14th Dist.] July 1, 2008, no pet.) (mem. op.); see also Tex. R. Evid.
703 (providing that an expert may draw inferences from the facts or data in a
particular case); Tex. R. Evid. 705 (providing that expert may testify in terms
of opinions and inferences).

VI. 
Analysis








The
Hospital argues in its sole issue that the expert reports by Dr. Halkos and
Nurse Hayman are insufficient and that the trial court abused its discretion by
denying the Hospital=s motion to dismiss.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(l).  Dr. Halkos=s
and Nurse Hayman=s expert reports discuss the
acts and omissions of three of the Hospital=s
nurse-employees:  Donna L. McElravy,
R.N.; Chad Hammonds, R.N.; and Garland Gill, R.N.  We address the allegations against each of
these nurse-employees in turn.

A.      Duty and Alleged Breach by Nurse McElravy

The
Hospital contends Dr. Halkos=s
report is insufficient because it does not adequately describe the standard of
care applicable to Nurse McElravy or how Nurse McElravy allegedly breached the
standard of care. 

Relevant
portions of Dr. Halkos=s report provide:

McElravy
was responsible for assisting Dr. Bolton in managing the post-operative
anticoagulation therapy of Mr. Smith to prevent thrombus formation as a result
of the mechanical valve replacement surgery performed on the patient.  At that time, the incidence of thrombus
(blood clot) complications of following mechanical valve replacement surgery
was or should have been a matter of common knowledge to reasonably prudent
registered nurses specializing in cardiovascular and thoracic surgery. 

 

McElravy should have properly monitored
anticoagulant therapy for Mr. Smith in a manner that would maintain an INR
(International Normalized Ratio) of 2.5 to 3.5; or a PTT (Partial
Thromboplastin Time) of 1.5 to 2.5 times the control. . . . On the morning of
July 4, 2006, at about 9:00 a.m., Dr. Bolton noted an INR greater than 3 in Mr.
Smith, and recorded in the progress notes that Mr. Smith=s INR was greater
than 3 and noted to hold the administration of coumadin that night.  [The Hospital] laboratory reported critically
abnormal results of Mr. Smith=s PT (protime) at
about 9:34 a.m., as being greater than 120 seconds[,] and the laboratory was
unable to calculate the INR.  The protime
greater than 120 seconds value reflected an excessive and potentially dangerous
state of anticoagulation in Mr. Smith=s blood. 









When the critically abnormal PT results and
lack of a calculable INR were reported, McElravy should have become aware of
this information, and reported such values to Dr. Bolton, Dr. Russell, or PA
Dizney and cause repeat testing of a new blood specimen from Mr. Smith to
verify the previously noted and reported critical results. . . .  Therefore, when McElravy discovered or should
have discovered that Dr. Bolton improperly recorded Mr. Smith=s INR as greater than
3, she failed to meet the applicable standard of reasonable and prudent nursing
care in that she failed to bring to Dr. Bolton or PA Dizney=s attention Dr.
Bolton=s improper assessment
of Mr. Smith=s INR on the morning
of July 4, 2006[;] she also failed to meet the standard of reasonable nursing
care in failing to recognize Mr. Smith=s excessive anticoagulation blood condition,
report such condition to Dr. Bolton, Dr. Russell or PA Dizney and bring about
appropriate intervention to correct this dangerous condition for Mr. Smith.








Dr.
Halkos=s
report adequately describes Nurse McElravy=s
duties and alleged breaches of those duties. 
The report states that McElravy: (1) had a duty to assist Dr. Bolton
with Mr. Smith=s
post-operative anticoagulation therapy; (2) should have known the incidence of
thrombus following mechanical valve replacement surgery; (3) should have
monitored Mr. Smith=s anticoagulant therapy so
as to maintain an INR of 2.5 to 3.5 or a PTT of 1.5 to 2.5 times the control;
(4) should have known Dr. Bolton incorrectly recorded the INR as greater than
3; (5) failed to report Dr. Bolton=s
incorrect assessment of Mr. Smith=s
INR; and (6) failed to recognize or report Mr. Smith=s
excessive anticoagulation blood condition to Dr. Bolton, Dr. Russell, or PA
Dizney.  These statements, all contained
within the four corners of Dr. Halkos=s
report, are sufficient to inform the Hospital of the specific conduct by Nurse
McElravy that the Smiths have called into question and provide a basis for the
trial court to conclude that the Smiths=
claim has merit.  See Bowie Mem=l
Hosp., 79 S.W.3d at 52; Palacios, 46 S.W.3d at 879.

The
Hospital also argues that several individual statements in Dr. Halkos=s
report are insufficient.[2]  We do not address these specific arguments by
the Hospital, however, because Dr. Halkos=s
report, as a whole, provides a Afair
summary@ of
his opinions; it (1) sufficiently informs the Hospital of the conduct the
Smiths question and (2) provides the trial court with a basis to conclude the
Smiths=
claim has merit.  See Tex. Civ.
Prac. & Rem. Code Ann. '
74.351(r)(6); Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 879; Benavides v. Garcia,
278 S.W.3d 794, 799 (Tex. App.CSan
Antonio 2009, pet. denied) (stating that opinion in expert report, read in
isolation, appeared conclusory, but holding that opinion was sufficiently
described in context of entire report). 
The trial court did not abuse its discretion by finding that Dr. Halkos=s
report adequately address Nurse McElravy=s
alleged duties and breaches of those duties.

B.      Duty and Alleged Breach by Nurse Hammonds








The
Hospital also contends Nurse Hayman=s
report and supplemental report are insufficient because they do not adequately
describe the standard of care applicable to Nurse Hammonds or how Nurse
Hammonds allegedly breached the standard of care. 

Relevant
portions of Nurse Hayman=s report provide:

Nurse Hammonds was responsible for providing
reasonable and prudent nursing diagnosis, assessment, care and treatment for
Mr. Smith=s post-operative
conditions and well-being in the [Hospital] ICU, and this responsibility
included careful and frequent monitoring of his physical and mental conditions,
the plan of care from multiple consultants, and the delivery of ongoing
intensive nursing care in the ICU and interventions as prescribed by attending
and consulting physicians as well as reasonable nursing practices. 

 

Nurse
Hammonds administered 4 mg of morphine sulfate by IV and 15 mg of hydrocodone
by mouth at 2000 (8:00 PM) on 7/04/06. Nurse Hammonds failed to properly
administer the PRN (as necessary) pain control orders because he should have
known that both medications should not have been administered to Mr. Smith in
one dose.  If Nurse Hammonds believed
such orders allowed the choice to administer both medications at one time, then
Hammonds failed to question or clarify Dr. Bolton=s orders.  It was a violation of the reasonable and
prudent standards of nursing care for a critical care nurse to administer the
medications in that manner or not to call Dr. Bolton and question the orders. 

 








Nurse Hammonds failed to perform sufficient
surveillance to discover the removal of the IJ catheter in time to prevent Mr.
Smith=s hemorrhagic
arrest.  A reasonably prudent critical
care nurse . . . should have known that continuous bleeding for approximately
30B45 minutes would lead
to hemorrhagic cardiac arrest. 
Therefore, it is reasonable to conclude, in reasonable nursing
probability, that Defendant Hammonds failed to see and assess Mr. Smith for at
least 30 minutes prior to his arrest. According to the hospital records,
Hammonds recorded Mr. Smith=s vital signs at a
time prior to his arrest when the Quinton catheter must have been out and
therefore significant bleeding would and should have been obvious to a critical
care nurse, including Hammonds, performing duties according to the standards
for reasonable and prudent nurses in ICU settings.  The hospital ICU records indicate that
Hammonds either failed to properly observe Mr. Smith, or he did not accurately
and completely record his nursing actions in the hospital record, and both such
failures would be a violation of the applicable standard of nursing care for
Hammonds. 

 

Nurse Hammonds failed to set alarm limits on
the physiologic monitors that reflected the patient=s baseline vital
signs and thereby failed to discover when various parameters were in alarm
condition. . . .  Hammonds either failed
to transduce the IJ catheter to the alarm system or he failed to respond to the
alarm condition caused by the removal of the device.  In either situation, Hammonds failed to meet
the applicable standard of nursing care for Mr.
Smith. . . .  In violation
of the standards for reasonable and prudent critical care nursing, Nurse
Hammonds failed to document alarm conditions, rhythm strips, oxygen
de-saturation or his nursing responses to any of the abnormalities that
occurred before Mr. Smith exsanguinated (bled out) into arrest.

 

The
hospital code record reflects that ECG monitoring and pulse oximetry were in
progress at the time of the arrest event. Defendant Hammonds either failed to
establish that monitoring or he ignored the alarm conditions that would have
occurred in the setting of Aagonal breathing.@  Mr. Smith=s agonal breathing would have caused alarm
conditions in the rate of respirations and oxygen saturation on the alarm
system. . . . Defendant Hammonds failed to recognize, intervene in, or document
and report any such alarm conditions for Mr. Smith at that time.  Further, Hammonds had an obligation to be in
audible or visual proximity to promptly and adequately respond to any such
clinical or physiological alarm conditions. 

 

Using
the physiologic monitoring system, Nurse Hammonds should have established and
monitored clinical alarms/limits based on [Mr. Smith=s] condition . . . .
All central venous lines or catheters, like the left internal jugular catheter,
should have been transduced to the physiological monitoring system such that
the monitoring system would alarm when a central line became disconnected. 

 








Defendant Hammonds failed to perform
sufficient surveillance to discover the removal of the IJ catheter in time to
prevent Mr. Smith=s hemorrhagic
arrest.  A reasonably prudent critical
care nurse, would have known that continuous bleeding for approximately 30B45 minutes would lead
to hemorrhagic cardiac arrest. 
Therefore, in reasonable medical probability, Hammonds failed to observe
Mr. Smith for 30B45 minutes prior to
the arrest event. 

In addition, Nurse Hayman=s
supplemental report provides that the standard of care applicable to Nurse
Hammonds requires him to have basic knowledge of all medications he administers
to a patient, including the potential side effect of the medications to assess,
from a nursing perspective, Adecreased
levels of consciousness, disorientation, and/or sedation in patients@
similar to Mr. Smith, and to Autilize
wrist restraints in the care of patients, including Mr. Smith, who demonstrate
a decreased level of consciousness, disorientation, and/or sedation in order to
prevent the patient from causing injury to himself.@  Nurse Hayman=s
supplemental report states that Nurse Hammonds failed to appreciate the
potential side effects of simultaneous doses of morphine sulphate and
hydrocodone, failed to assess, from a nursing perspective, Mr. Smith=s
resulting neurological impairment and decreased levels of consciousness,
disorientation, and/or sedation, and failed to utilize wrist restraints to
prevent Mr. Smith from causing injury to himself.








Nurse
Hayman=s
report and supplemental report provide that Nurse Hammonds:  (1) had a duty to monitor Mr. Smith=s
post-operative mental and physical conditions; (2) had a duty to either
question or clarify Dr. Bolton=s
order before administering both morphine and hydrocodone to Mr. Smith but
failed to do either; (3) failed to assess, from a nursing perspective, or
appreciate Mr. Smith=s altered level of
consciousness; (4) failed to use bilateral soft wrist restraints or obtain
orders from Dr. Bolton or Dr. Russell for wrist restraints; (5) failed to
provide sufficient observations and surveillance of Mr. Smith; (6) failed to
recognize that Mr. Smith=s Quinton catheter had been
removed while recording Mr. Smith=s
vital signs; (7) failed to timely discover the removal of Mr. Smith=s
Quinton catheter; and (8) either failed to establish a physiologic monitoring
system and set the appropriate alarm limits on the monitoring system or failed
to monitor and document the alarms from the monitoring system.  These statements, all contained within the
four corners of Nurse Hayman=s
report, are sufficient to inform the Hospital of the specific conduct by Nurse
Hammonds that the Smiths have called into question and provide a basis for the
trial court to conclude that the claim has merit.  See Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 879.  The trial court did not abuse its discretion
in finding that Nurse Hayman=s
report and supplemental report sufficiently address duty and alleged breach of
duty as to Nurse Hammonds.

C.      Duty and Alleged Breach by Nurse Gill

The
Hospital next contends Nurse Hayman=s
report and supplemental report are insufficient because they do not adequately
describe the standard of care applicable to Nurse Gill or how Nurse Gill
allegedly breached the standard of care.

Relevant
portions of Nurse Hayman=s report provide:








Nurse Gill was responsible for providing
reasonable and prudent nursing diagnosis, assessment, care and treatment for
Mr. Smith=s post-operative
conditions and well-being in the [Hospital] ICU, and this responsibility
included careful and frequent monitoring of his physical and mental conditions,
the plan of care from multiple consultants, and the delivery of ongoing
intensive nursing care in the ICU and interventions as prescribed by attending
and consulting physicians as well as reasonable nursing practices. 

 

Nurse Gill failed to perform sufficient
surveillance to discover the removal of the IJ catheter in time to prevent Mr.
Smith=s hemorrhagic
arrest.  A reasonably prudent critical
care nurse, should have known that continuous bleeding for approximately 30B45 minutes would lead
to hemorrhagic cardiac arrest. Therefore, it is reasonable to conclude, in
reasonable nursing probability, that Defendant Gill failed to see and assess
Mr. Smith for at least 30 minutes prior to his arrest.  The hospital ICU records indicate that Gill
either failed to properly observe Mr. Smith, or he did not accurately and
completely record his nursing actions in the hospital record, and both such
failures would be a violation of the applicable standard of nursing care for
Gill.

 

Defendant
Gill failed to recognize, intervene in, or document and report any such alarm
conditions for Mr. Smith at that time. Further, Gill had an obligation to be in
audible or visual proximity to promptly and adequately respond to any such
clinical or physiological alarm conditions.

 

Using
the physiologic monitoring system, Nurse Gill should have established and
monitored clinical alarms/limits based on [Mr. Smith=s] condition . . . .
All central venous lines or catheters, like the left internal jugular catheter,
should have been transduced to the physiological monitoring system such that
the monitoring system would alarm when a central line became disconnected. 

 








Furthermore, Nurse Hayman=s
supplemental report states that the standard of care applicable to Nurse Gill
requires him to have basic knowledge of all medications he administers to a
patient, including the potential side effect of the medications to assess, from
a nursing perspective, Adecreased levels of
consciousness, disorientation, and/or sedation in patients@
similar to Mr. Smith, and to Autilize
wrist restraints in the care of patients, including Mr. Smith, who demonstrate
a decreased level of consciousness, disorientation, and/or sedation in order to
prevent the patient from causing injury to him[self].@  Nurse Hayman=s
supplemental report states that Nurse Gill failed to appreciate the potential
side effects of simultaneous doses of morphine sulphate and hydrocodone, failed
to assess, from a nursing perspective, Mr. Smith=s
resulting neurological impairment and decreased levels of consciousness,
disorientation, and/or sedation, and failed to utilize wrist restraints to
prevent Mr. Smith from causing injury to himself. 








Nurse
Hayman=s
report and supplemental report adequately describe Nurse Gill=s
duties and alleged breaches of those duties. 
The report and supplemental report provide that Nurse Gill: (1) had a
duty to monitor Mr. Smith=s post-operative mental and
physical conditions; (2) failed to, from a nursing perspective, assess or
appreciate Mr. Smith=s altered level of
consciousness; (3) failed to use bilateral soft wrist restraints or obtain
orders from Dr. Bolton or Dr. Russell for wrist restraints; (4) failed to
provide sufficient surveillance of Mr. Smith; (5) failed to timely discover the
removal of Mr. Smith=s Quinton catheter; and (6)
failed to establish or monitor and document a physiologic monitoring system
with the appropriate alarm limits.  These
statements, all contained within the four corners of Nurse Hayman=s
reports, are sufficient to inform the Hospital of the specific conduct by Nurse
Gill that the Smiths have called into question and provide a basis for the
trial court to conclude that the Smiths=
claim has merit.  See Bowie Mem=l, 79
S.W.3d at 52; Palacios, 46 S.W.3d at 879.  The trial court acted within its discretion
in finding that Nurse Hayman=s report
and supplemental report sufficiently address duty and alleged breach of duty as
to Nurse Gill.

D.      Causation

Finally,
the Hospital argues the Smiths=
expert reports are insufficient because they do not sufficiently describe how
the alleged breaches of the standard of care by the Hospital=s
three nurse-employees caused any harm to Mr. Smith.

Relevant
portions of Dr. Halkos=s report provide:

It
is my opinion that each of the above-described failures of Dr. Bolton, Dr.
Russell, Dr. Suominen, PA Dizney, Nurse McElravy, Nurse Hammonds, and Nurse
Gill to meet the reasonable, prudent, and accepted standards of medical,
nursing and health care in the diagnosis, assessment, care and treatment of
[Mr.] Smith=s post-operative and
clinical conditions, separately and collectively, probably caused Mr. Smith to
experience a worsening of his physical and mental conditions leading to his
pulling out the Quinton catheter resulting in significant and severe bleeding
that led to his hemorrhagic cardiopulmonary arrest with pulseless electrical
activity, resuscitation, additional deterioration, and his death . . . . 

 

Dr. Bolton and Dr. Russell=s
failures to be notified [by Nurse McElravy] of Mr. Smith=s
severe abnormal anticoagulation condition, as demonstrated by his incalculable
and undetermined INR as of July 4, 2006, due to his abnormally high protime
(greater than 120 seconds), allowed his excessive anticoagulation condition to
continue unrecognized and uncorrected. 








If
Dr. Suominen, PA Dizney or Nurse McElravy had properly evaluated Mr. Smith=s conditions and
notified Dr. Bolton and Dr. Russell of such conditions, then in all
probability, Mr. Smith=s state of excessive
anticoagulation would have been recognized and corrected because the applicable
standards of medical care for Dr. Bolton and Dr. Russell would have required
them to take such action under the circumstances.  Unfortunately, Mr. Smith=s state of excessive
anticoagulation continued and the administration of large doses of narcotic
pain medications administered by Nurse Hammonds to Mr. Smith on the evening of
July 4, 2006, in all probability led to disorientation and neurological
impairment in Mr. Smith such that he was able to self-remove the left internal
jugular Quinton catheter causing massive hemorrhage leading to exsanguinating
cardiopulmonary arrest.  Although the
sequence of events leading up to Mr. Smith=s hemorrhagic arrest is not accurately or
completely documented in the [Hospital] medical record, it is likely that Mr.
Smith=s neurological
impairment, caused by the large doses of narcotic pain medications for the
above-discussed reasons, allowed him to avoid suffering the significant pain of
self-removal of the Quinton catheter from his neck and not be alarmed by the
subsequent massive hemorrhage he experienced and summon the [Hospital] nursing
staff for help. 

 

Dr.
Suominen=s failure to
adequately secure the Quinton catheter to Mr. Smith=s neck and Nurse
McElravy=s failure to cause to
be ordered[] soft wrist restraints in the setting of Mr. Smith=s altered level of
consciousness allowed this series of events to occur where Mr. Smith was able
to pull out the Quinton catheter and experience massive bleeding.  If Dr. Suominen had adequately secured the
Quinton catheter in Mr. Smith=s neck and if Nurse
McElravy had caused to be ordered[] soft wrist restraints in the setting of Mr.
Smith=s altered level of
consciousness this series of events where Mr. Smith was able to pull out the
Quinton catheter and experience massive bleeding in all lilklihood [sic] would
not have occurred and would not have progressed to cardiopulmonary arrest. 

 








Nurses
Hammonds[>] and Gill=s failures to
properly and adequately monitor Mr. Smith=s above-described activities and conditions
resulted in their failures to timely and properly recognize his removal of the
Quinton catheter and the bleeding from the catheter site before he experienced
hemorrhagic cardiopulmonary arrest. . . . Nurses Hammonds and
Gill failed to closely monitor Mr. Smith=s conditions for a period of at least 30 to
45 minutes before Hammonds[=s] discovery of Mr.
Smith=s hemorrhagic
arrest.  If Nurses Hammonds and Gill had
timely discovered Mr. Smith=s self-removal of the
Quinton catheter within 30 to 45 minutes before arrest, and implemented proper
interventional procedures, it is likely that Mr. Smith=s significant
bleeding condition could have been stopped and would not have progressed to
cardiopulmonary arrest.  Although Mr.
Smith=s clinical condition
had a mortality of about twenty percent prior to the arrest, the
above-discussed failures of Dr. Bolton, Dr. Russell, Dr. Suominen, PA Dizney,
McElravy, Hammonds, and Gill probably led to the arrest and the sequelae that
probably ensued and in reasonable probability led to his progressive weakness,
increasing renal dysfunction, and multi-system organ failure and his death.

 

These
statements, all contained within the four corners of Dr. Halkos=s
report, sufficiently link Dr. Halkos=s
causation opinions to the facts and adequately describe the chain of events
allegedly leading to Mr. Smith=s
death.  See Patel v. Williams, 237
S.W.3d 901, 905B06 (Tex. App.CHouston
[14th Dist.] 2007, no pet.) (holding expert report sufficiently set forth
causation when it presented a chain of events beginning with a contraindicated
prescription and ending with the patient=s
death).  The trial court acted within its
discretion in finding that Dr. Halkos=s
report sufficiently address the element of causation.[3]

We
overrule the Hospital=s sole issue.

VII. 
Conclusion

Having
overruled the Hospital=s sole issue, we affirm the
trial court=s
order.

 

 

ANNE GARDNER

JUSTICE

 

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

 

DELIVERED:  May 20, 2010











[1]The trial court
stated, AWhile [Nurse Hayman=s report] was
deficient in part, I find that the Halkos report was sufficient to create a
basis for asserting a claim that fairly put the Hospital on notice of the type
of claims that are being asserted against it by and through the nurses.@  The trial court also stated that its partial
grant of the Hospital=s objection to Nurse
Hayman=s report is Akind of irrelevant
because I find that it=s [otherwise]
sufficient.@





[2]For example, the
Hospital argues Dr. Halkos=s report states that
Nurse McElravy Ashould have properly
monitored anticoagulant therapy for Mr. Smith@ but does not explain
how Nurse McElravy improperly monitored anticoagulant therapy or how Nurse
McElravy should have monitored it and does not state how McElravy was negligent
in not having information about Acritically abnormal PT . . . results and lack
of calculable INR@ as alleged in the
report.





[3]The Hospital also
argues that Nurse Hayman is not qualified to render causation opinions.  We need not address this argument, however,
because Dr. Halkos=s report, without
reference to Nurse Hayman=s report,
sufficiently addresses the causation element in the Smiths= claim against the
Hospital.  See Tex. R. App. P.
47.1.